T.C. Memo. 2005-173

UNITED STATES TAX COURT

TRANSPORT LABOR CONTRACT/LEASING, INC. & SUBSIDIARIES, Petitioner
<u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 1188-01.                    Filed July 14, 2005.

<u>Michael I. Saltzman</u>, <u>Kathleen Pakenham</u>, and <u>Todd C. Simmens</u>,
for petitioner.

<u>Jack Forsberg</u>, <u>Gary R. Shuler, Jr.</u>, and <u>Eric Johnson</u>, for
respondent.

SUPPLEMENTAL MEMORANDUM OPINION

CHIECHI, <u>Judge</u>:  This case is before us on petitioner's

_____

[*]This Supplemental Memorandum Opinion supplements our prior
Opinion in <u>Transp. Labor Contract/Leasing, Inc. & Subs. v.
Commissioner</u>, 123 T.C. 154 (2004).

motion for reconsideration of the Court's Opinion in this case (petitioner's motion for reconsideration) set forth in 123 T.C. 154 (2004) (Transport Labor I) and petitioner's motion to vacate or revise the Court's decision in this case (petitioner's motion to vacate). The Court held in Transport Labor I that the limitation imposed by section 274(n)(1)[1] (section 274(n)(1) limitation) applied to the amounts (per diem amounts) that petitioner's wholly owned subsidiary Transport Leasing/Contract, Inc. (TLC), paid during each of the taxable years at issue to certain truck drivers in order to cover the amounts that they spent for food and beverages.[2]

## Background

We incorporate herein by reference the findings of fact set forth in Transport Labor I. We repeat here the facts helpful in understanding the discussion that follows.

TLC was a driver-leasing company that leased one or more truck drivers to small and mid-sized independent trucking companies which used such truck drivers to transport goods and mer-

---

[1] All section references are to the Internal Revenue Code in effect for the taxable years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] We shall refer to such expenses as food and beverage expenses. See Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. 154, 155 n.4 (2004).

chandise.[3] Prior to the times such trucking companies entered into driver-leasing arrangements with TLC (described below), they had generally made payments only to their respective over-the-road[4] truck drivers who worked for them that were intended to cover the amounts that such truck drivers spent for food and beverage expenses while traveling away from home.

During the years at issue, the number of trucking company clients to which TLC leased driver-employees ranged from 100 to 300, with most such companies located in Minnesota, Montana, and Pennsylvania.[5] As of the time of trial in this case, TLC leased a total of 5,563 driver-employees to a total of 453 trucking company clients.

In soliciting business, TLC's sales representatives explained to prospective trucking company clients the advantages that they would realize from leasing driver-employees from TLC. A principal advantage of leasing driver-employees from TLC related to TLC's ability to obtain cost-effective workers' compensation insurance, especially in States where trucking

---

[3]We shall refer to each trucking company that leased one or more truck drivers from TLC as a trucking company client and to each truck driver whom TLC leased to a trucking company client as a driver-employee.

[4]The term over-the-road means that the length of travel required a truck driver to stay away from home overnight.

[5]During the years at issue, the number of truck drivers that each trucking company client leased from TLC ranged from 1 to 50.

company clients were paying substantial amounts to obtain such insurance. Generally, the premium rates for workers' compensation insurance on truck drivers were significantly higher than premium rates for most other occupations. As a result, workers' compensation insurance was a major expense for trucking companies. In soliciting a trucking company's business, TLC's sales representatives explained that TLC was able to obtain workers' compensation insurance in the private market at comparatively low premium rates because of the large number of driver-employees on whom it obtained such insurance.

When TLC was successful in attracting a trucking company as a client, TLC and that trucking company entered into a contract entitled "TLC Exclusive Lease Agreement" (exclusive lease agreement), which set forth the agreement between them with respect to the leasing by such trucking company of driver-employees from TLC.[6] When each trucking company entered into an exclusive lease agreement with TLC, such trucking company terminated the employment arrangement that it previously had with all of its truck drivers.

---

[6]Each exclusive lease agreement was a standard TLC form contract. There were no agreements between TLC and any trucking company client regarding TLC's leasing driver-employees to such trucking company client other than the agreement set forth in the exclusive lease agreement. The material provisions of each exclusive lease agreement remained unchanged throughout the taxable years at issue except for the factor (discussed below) used to compute the lease fee that each trucking company client owed TLC.

TLC retained the sole and absolute authority to hire each driver-employee and to terminate each driver-employee's employment with TLC. Each truck driver whom TLC hired as a driver-employee played an integral role in TLC's business of leasing driver-employees to its trucking company clients.

Before TLC hired a truck driver as a driver-employee, such truck driver had to pass TLC's screening and approval process that it used to determine whether to hire such truck driver. (We shall refer to the screening and approval process that TLC used to determine whether to hire a truck driver as TLC's screening and approval process.) TLC's screening and approval process was designed to determine a truck driver's fitness to serve as a driver-employee of TLC.

As required by each exclusive lease agreement, TLC used its best efforts (e.g., by advertising) to, and did, recruit driver-employees. TLC hired approximately 25 percent of its driver-employees through its own recruitment efforts.

Each trucking company client also located and referred prospective driver-employees to TLC. If a trucking company client located a truck driver whom it wanted TLC to hire, the trucking company client interviewed such truck driver, had him or her complete an application provided by TLC, and forwarded that completed application to TLC. TLC subjected any such truck driver to TLC's screening and approval process. TLC rejected 10

to 15 percent of the truck drivers whom its trucking company clients referred to it. TLC hired approximately 75 percent of its driver-employees through referrals of trucking company clients.

TLC had the right to, and did, direct and control the work and conduct of each driver-employee. TLC exercised that right through, inter alia, the driver-employee contract and the driver-employee handbook (discussed below). TLC required each driver-employee whom it hired to sign a document entitled "DRIVER EMPLOYEE CONTRACT" (driver contract). Each driver contract provided instructions for each driver-employee that required each driver-employee, inter alia, to attend at least two safety meetings per year, not to be under the influence of alcohol while performing services for TLC, not to consume illegal drugs, to complete any paperwork required by TLC or its affiliates, and not to allow any personal, legal, or financial problems, including attitude, to interfere with the performance of services for TLC. If a driver-employee failed to comply with those instructions, TLC could terminate such driver-employee's employment.

When TLC hired each driver-employee, TLC gave such driver-employee a truck driver handbook (TLC driver handbook). The TLC driver handbook, which was incorporated into and made part of the driver contract, contained TLC's detailed instructions that it required each driver-employee to follow with respect to, inter

alia, fueling the trucks, starting the trucks' engines, hooking up the trucks to trailers, parking the trucks, driving the trucks to achieve maximum fuel savings, braking the trucks, operating trucks in cold weather, departure times of the trucks, and loading the cargo on and unloading it off the trucks.[7]  Thus, TLC had the right to, and did, direct and control each driver-employee as to the operation and the loading and unloading of the truck of the trucking company client that leased such driver-employee from TLC and as to the details and means by which that operation and that loading and unloading were to be accomplished.

Both before and after entering into an exclusive lease agreement with TLC, each trucking company client:  (1) Owned or leased the trucks, semitrailers, terminals, and other equipment and facilities used in its trucking business; (2) obtained the customers whose goods and merchandise it transported by truck; (3) performed dispatching functions with respect to each driver-employee by giving such driver-employee his or her route assignments, directing each driver-employee as to the loads assigned to him or her and as to the times by which such driver-employee had to deliver those loads, and relaying any instructions of its customers relating to such loads; (4) was responsible for the payment of tolls, fuel, repairs, and scale fees incurred during

---

[7]The TLC driver handbook consisted of approximately 50 pages covering the various matters with respect to which TLC gave detailed instructions to each driver-employee.

the transport of such goods and merchandise;  and (5) had the authority to determine whether to permit a driver-employee whom TLC leased to it to take any vacation days.  TLC did not own any interest in, had no rights in the profits of, and had no responsibility for the losses of the business of any trucking company client.

TLC sponsored certain employee benefits for its driver-employees, including:  (1) A section 401(k) plan; (2) a section 125 flexible benefit plan; (3) group or individual health insurance; (4) a $5,000 group term life insurance policy; and (5) the option of purchasing additional group term life insurance.  TLC paid the premiums and any administrative costs associated with the $5,000 group term life insurance policy.  TLC bore the administrative costs but no other costs associated with the various other employee benefits that it sponsored for its driver-employees.  Each driver-employee paid such other costs through payroll deductions.[8]

Pursuant to each exclusive lease agreement, each trucking company client had the right to decline using a particular driver-employee whom TLC wanted to lease to it.  While TLC was

---

[8]Certain trucking company clients paid at least part of the premiums associated with the health insurance plan that TLC sponsored for the driver-employees whom TLC leased to them.  In such instances, TLC paid the trucking company client's share of such health insurance premiums and charged such premiums to the trucking company client.

leasing a driver-employee to a trucking company client, TLC had the right to lease that driver-employee to another trucking company client and thereby assign additional projects to such driver-employee.

If a trucking company client no longer wanted or needed the services of a particular driver-employee, TLC did not continue leasing such driver-employee to that trucking company client.  In that event, TLC attempted to lease such driver-employee to another trucking company client.  TLC frequently was successful in reassigning a driver-employee from one trucking company client that no longer wished to use such driver-employee to another trucking company client.  TLC also reassigned to another trucking company client any driver-employee who no longer wished to work with a particular trucking company client to which TLC had assigned such driver-employee.  If a driver-employee refused such reassignment, TLC treated him or her as having voluntarily terminated his or her employment with TLC and contested any unemployment claims that such driver-employee filed.[9]

Each of TLC's driver-employees who was engaged in over-the-road trucking paid for food and beverage expenses while traveling away from home.  TLC generally made payments of per diem amounts to each such driver-employee that TLC intended to cover such food

---

[9]Because of the large number of driver-employees and the low rate of successful claims, TLC usually paid the minimum rate imposed by the applicable State Unemployment Tax Act (SUTA).

and beverage expenses. TLC did not pay any per diem amounts to a driver-employee whom it leased to a trucking company client who was not engaged in over-the-road trucking for that client.

At the end of each payroll period,[10] each trucking company client mailed or sent by facsimile to TLC a batch control form (batch report) with respect to such period. For each payroll period, the batch report that each trucking company client submitted to TLC showed for each driver-employee whom TLC leased to such trucking company client, inter alia, (1) a lump sum amount (batch report lump sum amount) from which TLC was to determine the gross wages[11] and any per diem amounts to which each driver-employee was entitled but which was not broken down into such component parts;[12] (2) the total amount of expenses for

---

[10]Pursuant to the exclusive lease agreement, each trucking company client had the right to select the payroll period for all driver-employees whom TLC leased to such trucking company client.

[11]We shall refer to the gross amount of wages to which a driver-employee was entitled, prior to any reduction for such driver-employee's share of Federal and State employment taxes, Federal and State income taxes withheld, and payroll deductions for employee benefits (e.g., health insurance, a sec. 401(k) plan, or a sec. 125 flexible benefit plan), as gross wages.

[12]Pursuant to each exclusive lease agreement, each trucking company client, and not TLC, selected the method used in calculating the batch report lump sum amount for each driver-employee whom TLC leased to such trucking company client. Virtually all of TLC's trucking company clients selected a cents-per-mile or a percentage-of-load-gross-revenue basis as the applicable method. Neither the batch report nor any other document that a trucking company client submitted to TLC showed the breakdown of the batch report lump sum amount between gross wages and any per diem
(continued...)

gas, tolls, repairs, and other road expenses for which such trucking company client (a) made cash advances (advances)[13] and/or (b) was obligated to make reimbursements to such driver-employee (reimbursable expenses); (3) any miscellaneous credits or deductions (e.g., for the costs of health insurance that such trucking company client agreed to pay); (4) any vacation days that such trucking company client permitted such driver-employee to take;[14] and (5) the number of days such driver-employee was away from home.

TLC determined what portion of the batch report lump sum amount constituted gross wages and what portion, if any, constituted per diem amounts to which each driver-employee was entitled.[15] In order to make that determination, TLC applied to each batch report lump sum amount with respect to each driver-employee a percentage (per diem percentage). In most cases, the per diem percentage was 34 percent; in some cases, the per diem percentage

---

[12](...continued)
amounts.

[13]Except for such advances, no trucking company client made any payments to a driver-employee.

[14]If the batch report indicated that the trucking company client permitted a driver-employee whom TLC leased to it to take any vacation days, TLC paid no per diem amounts to such driver-employee for any such days.

[15]The exclusive lease agreement was silent as to (1) any per diem amounts that TLC was to pay to a driver-employee to cover such driver-employee's food and beverage expenses while traveling away from home and (2) the limitation imposed by sec. 274(n)(1).

ranged from zero to 33 percent.

Upon receipt of a batch report, TLC inputted the information contained in that batch report into its computer system and, based on that information and other information in its computer system (e.g., the per diem percentage, applicable employment tax rates, Federal and State income tax withholding), computed with respect to each driver-employee gross wages, any per diem amounts, Federal and State income taxes withheld, the driver-employee share of employment taxes,[16] payroll deductions for employee benefits, and net wages.[17]  Per diem amounts are not wages for purposes of computing employment taxes, Federal and State income tax withholding, and workers' compensation insurance premiums.  TLC determined each driver-employee's gross wages by reducing the batch report lump sum amount for such driver-employee by any per diem amounts that TLC determined for such driver-employee.

With respect to each driver-employee, for each payroll period TLC was obligated to, and did, pay such driver-employee

---

[16]We shall refer to any tax liabilities imposed on either the employer or the employee with respect to a driver-employee's gross wages under the Federal Insurance Contribution Act (FICA), the Federal Unemployment Tax Act, or SUTA as employment taxes.

[17]We shall refer to the net amount of wages to which a driver-employee was entitled, after any reduction for such driver-employee's share of Federal and State employment taxes, Federal and State income taxes withheld, and payroll deductions for employee benefits (e.g., health insurance, a sec. 401(k) plan, or a sec. 125 flexible benefit plan), as net wages.

his or her net wages and any per diem amounts,[18] regardless of whether the trucking company client to which TLC leased such driver-employee paid TLC the lease fee (discussed below).  TLC generally paid such net wages and any per diem amounts to each driver-employee on the day after TLC received a batch report.  (We shall refer to TLC's obligation with respect to each driver-employee for each payroll period to pay to each such driver-employee such aggregate amount of net wages and any per diem amounts as well as its obligation to pay the employer's share of employment taxes, withhold and pay the driver-employee's share of employment taxes, withhold and pay Federal and State income taxes, make daily electronic funds transfers of the appropriate amounts of such taxes to the Internal Revenue Service (IRS) and appropriate State agencies, and pay workers' compensation insurance premiums as TLC's payroll obligation.)

Pursuant to each exclusive lease agreement, each payroll period each trucking company client paid TLC a lease fee (lease fee) that was not broken down into component parts.[19]  Each

---

[18]The aggregate amount of each driver-employee's net wages and any per diem amounts that such driver-employee was entitled to receive was increased by the amount of any reimbursable expenses for which a trucking company client was obligated to reimburse such driver-employee and decreased by the amount of any advances that a trucking company client paid to such driver-employee.

[19]Pursuant to each exclusive lease agreement, the aggregate amount of the batch report lump sum amount with respect to each
(continued...)

exclusive lease agreement set forth a factor (factor)[20] to which TLC and each trucking company client agreed and which such client was to multiply by the batch report lump sum amount in order to calculate the lease fee that such client owed to TLC for each driver-employee whom TLC leased to such client.

The factor to which TLC and each trucking company client agreed was intended to produce a lease fee sufficient to cover: (1) The batch report lump sum amount with respect to each driver-employee whom TLC leased to such trucking company client; (2) the employer's share of employment taxes on the gross wages to which each such driver-employee was entitled; (3) workers' compensation insurance premiums attributable to the gross wages earned by each such driver-employee; (4) other expenses that TLC incurred as costs of earning such lease fee, e.g., expenses for sales representatives and managers, legal and accounting services, and other

---

[19](...continued)
driver-employee was multiplied by the applicable factor (discussed below) to calculate the lease fee that each trucking company client owed TLC.

[20]Pursuant to the exclusive lease agreement, TLC had the right to modify the factor in the event Federal and State employment tax rates and/or workers' compensation insurance rates changed. From time to time, TLC modified the factor that it charged each trucking company client in order to reflect changes in TLC's workers' compensation insurance premiums. TLC and each trucking company client also had the right to modify the factor if, inter alia, the information that TLC collected from a trucking company client in order to substantiate the per diem amounts that TLC paid to the driver-employees whom it leased to such client changed (e.g., if a trucking company client reduced its over-the-road trucking business).

overhead; and (5) TLC's profit (profit).

The factor was a flat rate that ranged from 1.15 to 1.25. The factor was not broken down into component parts. Consequently, no trucking company client knew how much of the factor to which TLC and such trucking company client agreed was intended to cover each of the various expenses associated with TLC's driver-leasing business (e.g., gross wages, any per diem amounts, the employer's share of employment taxes, workers' compensation insurance, and compensation of persons who performed services for TLC other than TLC's driver-employees).

The batch report that each trucking company client submitted to TLC each payroll period included each trucking company client's computation of the lease fee to which TLC was entitled under the terms of the exclusive lease agreement. In order to calculate the amount of such lease fee payable to TLC for each payroll period, each trucking company client increased the amount of the lease fee to which TLC was entitled by (1)(a) the total amount of the reimbursable expenses due to each driver-employee whom TLC leased to such trucking company client and (b) any miscellaneous additions or carryover credits and reduced that sum by (2)(a) the total amount of advances that such trucking company client paid to each driver-employee whom TLC leased to it and (b) any miscellaneous subtractions or debit balances. (We shall refer to the amount of the lease fee payable each payroll period

to TLC by each trucking company client after such additions and subtractions as the payroll period net lease fee due.)

Each trucking company client generally paid TLC the payroll period net lease fee due, as reflected in the batch report, on the day on which TLC issued a check to each driver-employee for such driver-employee's net wages and any per diem amounts. Each trucking company client paid such payroll period net lease fee due by wire transfer or direct deposit into an account of TLC. TLC did not maintain separate accounts for the funds received from its respective trucking company clients. As discussed above, for each payroll period TLC was obligated to, and did, pay such driver-employee his or her net wages and any per diem amounts, regardless of whether the trucking company client to which TLC leased such driver-employee paid TLC the net lease fee due.

For the calendar years 1993, 1994, 1995, and 1996, TLC sent a form letter (per diem letter) to each trucking company client, which set forth the total of all per diem amounts that TLC paid to the driver-employees whom it leased to such trucking company client during the preceding calendar year. The per diem letter for calendar year 1993 (sent to each trucking company client early in calender year 1994) stated in pertinent part:

> Our billings to you include amounts paid, on your behalf, to our drivers, for road expenses; often referred to as per diem. The amounts billed are of course, reduced by the amounts you paid directly to the

drivers in the form of "advances", frequently an amount approximating an allowable per diem.

As required by tax law and part of our service, we have tabulated the per diems to be used in your tax return preparation. As payer of these amounts, you must afford them special treatment under the 20% reduction provision of Internal Revenue Code Section 274(n). You should take this into account when preparing your tax returns for your business and may want to forward a copy of this letter to your tax advisor.

The amount of per diem you paid to drivers, or which we partially paid on your behalf during 1993, was * * * [total of per diem amounts.[21]]

Petitioner filed consolidated Form 1120, U.S. Corporation Income Tax Return (Form 1120), as the parent corporation of a group of affiliated corporations for each of petitioner's taxable years 1993, 1994, 1995, and 1996. Schedule K, Other Information, included as part of each of those Forms 1120 showed business activity as "leasing" and product or service as "employees". Form 851, Affiliations Schedule, included as part of those Forms 1120 showed TLC's business activity as "leasing".

On October 27, 2000, respondent sent a notice of deficiency

---

[21]The per diem letters for the calendar years 1994, 1995, and 1996 were identical to the per diem letter for calendar year 1993 except that the reference to "20% reduction" was changed to "50% percent reduction" in order to reflect changes made to sec. 274(n)(1) by the Omnibus Budget Reconciliation Act of 1993 (OBRA 1993), Pub. L. 103-66, sec. 13209(a), 107 Stat. 469. In this connection, prior to its amendment by OBRA 1993, sec. 274(n)(1) limited a deduction for food or beverages to 80 percent of the amount otherwise allowable (80-percent limitation). For taxable years that began after Dec. 31, 1993, sec. 274(n)(1) limits a deduction for food or beverages to 50 percent of the amount otherwise allowable (50-percent limitation).

(notice) to petitioner. In that notice, respondent determined, inter alia, that the section 274(n)(1) limitation applied to the per diem amounts that TLC paid to its driver-employees.

Respondent sent a notice to each of the following trucking company clients of TLC in which respondent determined that each such trucking company client had a deficiency in Federal income tax (tax) for one or more taxable years[22] arising out of such trucking company client's failure to take into account the section 274(n)(1) limitation[23] and with respect to which each such trucking company client commenced proceedings in the Court, as follows:

| Trucking Company Client | Case at Docket No. |
|---|---|
| John and Kimberly Kohler (NBS Trucking) | 1026-01 |
| Joseph and Barbara Hix (Joe Hix Trucking) | 1062-01 |
| Blachowske Truck Line, Inc. | 1107-01 |
| Jones Brothers Trucking, Inc. | 1149-01 |
| Lake State Transport, Inc. | 1286-01 |
| Schak Trucking Inc. | 1287-01 |
| Donald Fiereck and Beverly Beumer-Fiereck (Parkway Auto Transport) | 1346-01 |

Respondent conceded the above-referenced cases. The Court

---

[22]The record did not disclose the taxable year(s) to which the respective notices issued to certain of TLC's trucking company clients pertained.

[23]In the instant case, the 80-percent limitation applies to taxable years ended Aug. 31, 1993, and Aug. 31, 1994, and the 50-percent limitation applies to taxable years ended on or after Aug. 31, 1995.

entered stipulated decisions in such cases, which reflected such concessions.

### Discussion

#### Petitioner's Motion for Reconsideration

In support of petitioner's position that the Court should grant petitioner's motion for reconsideration, petitioner advances the following arguments: (1) The Court erred in concluding that respondent impeached the testimony of Gary Ankerfelt (Mr. Ankerfelt); (2)(a) the Court did not consider the precedential effect of Beech Trucking Co. v. Commissioner, 118 T.C. 428 (2002) (Beech Trucking Co.), and (b) the factors used in determining whether a person is an employer or an employee[24] that the Court applied in Transport Labor I were inconsistent with the common-law employment factors applied by the Court in Beech Trucking Co.; and (3)(a) in finding certain facts, the Court gave improper weight to certain evidence, and (b) in determining whether TLC was the employer[25] of certain truck drivers whom it leased to certain trucking companies, the Court gave improper weight to certain facts that the Court found in Transport Labor I. Respondent opposes petitioner's motion for reconsideration.

---

[24]For convenience, we shall refer to the factors used in determining whether a person is an employer or an employee as the common-law employment factors.

[25]We accord the term "employer" the same meaning as the term "common-law employer". For convenience, we shall use only the term "employer".

The granting of a motion for reconsideration rests within the discretion of the Court. Estate of Quirk v. Commissioner, 928 F.2d 751, 759 (6th Cir. 1991), affg. in part and remanding in part T.C. Memo. 1988-286; Klarkowski v. Commissioner, 385 F.2d 398, 401 (7th Cir. 1967), affg. T.C. Memo. 1965-328; see Concordia Coll. Corp. v. W.R. Grace & Co., 999 F.2d 326, 330 (8th Cir. 1993). A motion for reconsideration will be denied unless unusual circumstances or substantial error is shown. Estate of Quirk v. Commissioner, supra; Alexander v. Commissioner, 95 T.C. 467, 469 (1990), affd. without published opinion sub nom. Stell v. Commissioner, 999 F.2d 544 (9th Cir. 1993); Vaughn v. Commissioner, 87 T.C. 164, 167 (1986).

With respect to petitioner's argument that the Court incorrectly concluded that respondent impeached the testimony of Mr. Ankerfelt, petitioner asserts:

> The Opinion incorrectly concluded that Gary Ankerfelt's credibility was impeached because the affidavit he submitted in a workers' compensation case involving Hix Trucking, a TLC customer, was contrary to his testimony at trial. A witness may be impeached only by a prior inconsistent statement. Here, however, Mr. Ankerfelt made no prior inconsistent statement; his testimony was consistent with his prior statement. * * * In any event, Mr. Ankerfelt's testimony was credible; his testimony on every point was corroborated by other witnesses.

On the record before us, we reject petitioner's argument.

At the trial in this case, Mr. Ankerfelt testified with respect to TLC's role in hiring, firing, and assigning projects

to its driver-employees:  (1) TLC exercised only an advisory role in hiring each driver-employee; (2) without exception, the trucking company client made the decision to terminate any driver-employee whom TLC leased to it; and (3) while TLC was leasing a driver-employee to a trucking company client, TLC had no right to lease that driver-employee to another trucking company client and thereby assign additional projects to such driver-employee (collectively, Mr. Ankerfelt's disputed trial testimony).  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 185-186.  Respondent introduced into the record an affidavit (Mr. Ankerfelt's affidavit) that Mr. Ankerfelt made under oath in Hix v. Minn. Workers' Comp. Assigned Risk Plan, 520 N.W.2d 497 (Minn. Ct. App. 1994).  In that affidavit, Mr. Ankerfelt swore under oath, inter alia:

> TLC recruits, screens and hires the employee-drivers that it leases to Joe Hix Trucking and other trucking companies.  TLC places advertisements to locate such drivers and makes all hiring decisions.  A lessee [trucking company client] has no authority to require TLC to hire a particular driver.
>
> * * * TLC has sole authority to determine the assignment of a driver.
>
> * * * TLC retains the sole right to discharge and fire any of its drivers-employees.  When a lessee no longer desires to lease a TLC driver-employee, the TLC driver-employee returns to TLC for assignment to another lessee.

The above-quoted statements from Mr. Ankerfelt's affidavit are inconsistent, or sufficiently inconsistent, with Mr.

Ankerfelt's disputed trial testimony.  Consequently, the Court in Transport Labor I found that respondent impeached Mr. Ankerfelt's disputed trial testimony.[26]  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, supra at 186.  In addition, the Court in Transport Labor I found that "respondent also raised other questions about the reliability of Mr. Ankerfelt's testimony that TLC exercised only an advisory role in hiring each driver-employee."  Id.  Respondent called as a witness Beverly Fiereck (Ms. Fiereck), the president of Parkway Auto Transport (Parkway), one of TLC's trucking company clients.[27]  Id.  Ms. Fiereck, whom the Court found to be credible, id., testified that TLC, and not Parkway, decided whether or not to hire a truck driver whom Parkway referred to it.  Id.  As a result of the foregoing, the Court did not rely on Mr. Ankerfelt's testimony to support petitioner's position that TLC was not the employer of

---

[26]Petitioner contends that, in order to use Mr. Ankerfelt's affidavit to impeach him, the Court must find Mr. Ankerfelt's affidavit to be credible.  Petitioner's contention is wrong.  The impeachment of Mr. Ankerfelt's disputed trial testimony arises from its inconsistency with Mr. Ankerfelt's affidavit and does not require that the Court find either Mr. Ankerfelt's disputed trial testimony or Mr. Ankerfelt's affidavit to be credible. See, e.g., Estate of Shafer v. Commissioner, 80 T.C. 1145, 1157 n.18 (1983), affd. on other grounds 749 F.2d 1216 (6th Cir. 1984).

[27]The parties stipulated that the testimony of any person representing Parkway is to be considered representative of the testimony that would be given by any persons representing other trucking company clients of TLC if they had been called to testify at the trial in this case.

each driver-employee.[28]

With respect to petitioner's argument that in Transport Labor I the Court did not consider the precedential effect of Beech Trucking Co., petitioner asserts:

> The Court made a "manifest error of law" when it failed to follow the binding precedent of Beech Trucking Co. v. Commissioner, 118 T.C. 428 (2002), in accordance with the Court's ruling in Boyd v. Commissioner, 122 T.C. 305 (2004). * * *

> In Boyd v. Commissioner, the Court described the [sic] "the analysis and reasoning" in Beech Trucking Co. as precedent binding on this Court under the doctrine of stare decisis. * * *

On the record before us, we reject petitioner's assertion.

As the Court stated in Transport Labor I, the determination of whether an individual is an employer is a fact-intensive inquiry. Id. at 184. Application of the common-law employment factors may produce different results in different cases that may appear to be facially similar. For example, in Weber v. Commissioner, 60 F.3d 1104 (4th Cir. 1995), affg. 103 T.C. 378 (1994), application of the common-law employment factors resulted in a finding that a Methodist minister was the employee of the United Methodist Church. In contrast, in Alford v. United States, 116 F.3d 334 (8th Cir. 1997), and Shelley v.

---

[28]To the extent other witnesses whom the Court found to be credible and reliable testified regarding matters about which Mr. Ankerfelt also testified, the Court based its findings upon the testimony of such other witnesses, as well as on the parties' stipulations of fact and documentary evidence in the record, and not on Mr. Ankerfelt's testimony.

Commissioner, T.C. Memo. 1994-432, application of the common-law employment factors resulted in findings that an ordained minister holding credentials in the Assemblies of God Church and a minister of the International Pentecostal Holiness Church, respectively, were not employees of their respective religious organizations.

The facts of the instant case are materially distinguishable from the facts in Beech Trucking Co. The Court in Beech Trucking Co. v. Commissioner, 118 T.C. at 441, 442 n.16, concluded:

> In the instant case, the evidentiary basis for analyzing the relevant common law factors is relatively sparse, owing largely to petitioner's [Arthur Beech, the tax matters person for Beech Trucking Company] failure to introduce in evidence or otherwise establish the precise terms of any lease agreement, employment agreement, or contract between Beech Trucking and ATS [driver-leasing company]. Nor does the record contain the drivers' employment contracts. Moreover, the record does not always clearly distinguish the roles of Beech Trucking and ATS with respect to the drivers' activities. We infer that their roles were to some degree blurred, especially taking into consideration that [Ed] Harvey, who owned [alone] ATS, also owned 26 percent of Beech Trucking, and that petitioner, who was president and 55-percent owner of Beech Trucking, was an employee of ATS.
>
> *       *       *       *       *       *       *
>
> Most of the pertinent testimony regarding the Beech Trucking drivers' activities came from petitioner. As previously noted, petitioner was both president of Beech Trucking and an employee of ATS * * * [and] his testimony often employed, ambiguously, first-person plural pronouns. * * *

The Court also concluded in Beech Trucking Co. that the record was "unclear as to the extent of any business ATS might have had

apart from the services it provided Beech Trucking." Id. at 443.

In contrast to the record before the Court in Beech Trucking Co., the Court in Transport Labor I had a complete, extensive, and clear record upon which to base its findings and conclusions and which included the exclusive lease agreement, the driver contract, the TLC driver handbook, and the testimony of representatives of various trucking company clients and TLC. In addition, there was no evidence, and petitioner does not contend, (1) that petitioner or TLC had any overlapping personnel with any trucking company client, (2) that petitioner or TLC owned any interest in any trucking company client, or (3) that any owner of a trucking company client owned an interest in petitioner.[29] Cf. id. at 430-431. Moreover, in contrast to ATS, which insofar as the record in Beech Trucking Co. revealed had only one trucking company as a client, viz., Beech Trucking Company, id. at 443, during the years at issue TLC had between 100 and 300 trucking company clients, Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 156. It is mere speculation on the part of petitioner to assume that if the facts in Beech Trucking Co. had been virtually the same as the facts in the instant case, which they are not, the Court in Beech Trucking Co. nevertheless would have evaluated the common-law employment factors in the

---

[29]TLC was a wholly owned subsidiary of petitioner. Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 155.

same manner as it did, would not have considered any common-law employment factors other than those that it considered, and would have found that Beech Trucking Company was the employer of the truck drivers whom it leased from ATS.

Beech Trucking Co. is materially distinguishable from the instant case and not binding on the Court with respect to the questions presented here. Petitioner is wrong in asserting that Boyd v. Commissioner, 122 T.C. 305 (2004), holds to the contrary. There was no dispute in Boyd v. Commissioner, supra, that the trucking company there involved (Continental) was the employer of the truck drivers who drove its trucks and that such trucking company was subject to the section 274(n)(1) limitation. Id. at 307. The sole issue in Boyd was the validity and effect of Rev. Procs. 94-77, 1994-2 C.B. 825, 96-28, 1996-1 C.B. 686, and 96-64, 1996-2 C.B. 427, that are not at issue in the instant case. In determining the validity and effect of those revenue procedures in Boyd, the Court indicated that it would apply "the analysis and reasoning" that Beech Trucking Co. applied in determining the validity and effect of those same revenue procedures. Id. at 311-312. In so stating, the Court in Boyd was not referring to the Court's discussion in Beech Trucking Co. with respect to the common-law employment factors.

With respect to petitioner's argument that the Court used certain common-law employment factors in Transport Labor I that

were inconsistent with the common-law employment factors that the

Court used in <u>Beech Trucking Co.</u>, petitioner asserts:

> the Court did not apply some of the factors used in
> <u>Beech Trucking</u>, restated factors used in <u>Beech Trucking</u>
> in a materially different way, and added a factor
> inapplicable to three-party transactions.  The Court's
> Opinion also uses a different analysis of the factors
> than the Court did in <u>Beech Trucking</u>. * * *

On the record before us, we reject petitioner's assertion.

The list of common-law employment factors that the Court set

forth in <u>Beech Trucking Co.</u> was nonexhaustive.  <u>Schwieger v. Farm

Bureau Ins. Co.</u>, 207 F.3d 480, 484 (8th Cir. 2000); <u>Beech

Trucking Co. v. Commissioner</u>, 118 T.C. at 440.  Petitioner does

not cite, and we have not found, any authority that precluded the

Court in Transport Labor I, in determining whether TLC was the

employer of each driver-employee whom it leased to each trucking

company client, from considering common-law employment factors in

addition to those on which the Court relied in <u>Beech Trucking Co.</u>

and from not giving the same weight to certain factors on which

the Court relied in <u>Beech Trucking Co.</u>

With respect to petitioner's argument that the Court in

Transport Labor I "restated factors used in <u>Beech Trucking</u> in a

materially different way", petitioner asserts that the Court in

Transport Labor I erred in considering the "sponsorship of * * *

employee benefits" rather than the "provision of employee

benefits".  Petitioner's assertion erroneously assumes that the

Court intended a substantive difference when it used the phrase

"sponsorship of * * * employee benefits" in Transport Labor I, and not the phrase "provision of employee benefits" that it used in Beech Trucking Co.

In Transport Labor I, the Court found that TLC sponsored certain employee benefits for its driver-employees, including: (1) A section 401(k) plan; (2) a section 125 flexible benefit plan; (3) group or individual health insurance; (4) a $5,000 group term life insurance policy; and (5) the option of purchasing additional group term life insurance. Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 169. The Court also found: (1) TLC paid the premiums and any administrative costs associated with the $5,000 group term life insurance policy; (2) TLC bore the administrative costs but no other costs of the section 401(k) plan, the section 125 flexible spending plan, and the group or individual health insurance; and (3) each driver-employee paid such other costs through payroll deductions.[30] Id. Only benefit plans established by an employer for the benefit of such employer's employees qualify for certain favorable tax treatment. See, e.g., secs. 401(a), (k), 125(a), (d), 79(a). Regardless of whether the phrase "sponsorship * * * of employee benefits" or "provision of employee benefits" was used, the fact remains that TLC established certain benefit plans for its driver-employees that could have qualified for such

---

[30]See supra note 8.

favorable tax treatment only if TLC were the employer of such driver-employees.

With respect to petitioner's argument that the Court in Transport Labor I "restated factors used in Beech Trucking in a materially different way", petitioner also asserts that in Beech Trucking Co. the Court found that if a relationship[31] between a truck driver and a trucking company is "of indefinite duration", such trucking company is the employer of such truck driver.  In this connection, petitioner contends:

> Here, substantial evidence proved that the employment relationship between the trucking companies and the drivers existed before TLC's involvement with the trucking companies.  The Lease Agreement had no effect on the duration of the drivers' relationship with the trucking companies because the drivers continued to work in the business of the trucking companies. * * *

On the record before us, we reject petitioner's assertion.

_____

[31]As the Court indicated in Transport Labor I, petitioner did not explain on brief, and does not explain in its motion for reconsideration, what it means when it argues that the "relationship" between a trucking company and its drivers was of indefinite duration. Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 195.  We presume that petitioner means that, after a trucking company entered into an exclusive lease agreement with TLC, each driver who previously worked for such trucking company continued to perform services for such company pursuant to the employment arrangement with such company that existed before it entered into such lease agreement with TLC.  We reject any such argument.  The parties stipulated, and the Court in Transport Labor I found, that, when each trucking company entered into an exclusive lease agreement with TLC, such trucking company terminated the employment arrangement that it had with all of the truck drivers who previously worked for such trucking company.  Id. at 159.

The facts of the instant case do not support petitioner's assertion that the exclusive lease agreement "had no effect on the duration of the drivers' relationship" with a trucking company where TLC leased such drivers as driver-employees of TLC to such trucking company as TLC's trucking company client. To the contrary, the exclusive lease agreement had a dramatic effect on such driver's employment relationship. As discussed above, if a truck driver had previously performed services for a trucking company and if such trucking company became a client of TLC by entering into an exclusive lease agreement with TLC, such truck driver's employment arrangement with such trucking company was terminated. Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, supra at 159. After a trucking company became a client of TLC and terminated the employment arrangement with any truck driver who had previously performed services for such trucking company, TLC had the sole and absolute authority to determine whether to hire such truck driver as a driver-employee. Id. at 164. TLC exercised that authority by, inter alia, requiring a truck driver, regardless of whether a trucking company client referred such driver to TLC as an applicant for the position of TLC's driver-employee, to pass TLC's screening and approval process before TLC decided whether to hire such truck driver as a driver-employee. Id.

If TLC decided to hire a truck driver who had previously

performed services for a trucking company client and if TLC leased such truck driver to such trucking company client, two new relationships involving such truck driver began: (1) A new relationship between TLC and such truck driver as a driver-employee of TLC; and (2) a new relationship between such trucking company client of TLC and such truck driver as a driver-employee of TLC whom TLC leased to such trucking company client. The relationship between TLC and a truck driver as a driver-employee was separate and distinct from the relationship between such trucking company client of TLC and such truck driver as a driver-employee of TLC whom TLC leased to such trucking company client. In addition, both of those new relationships were separate and distinct from any employment arrangement that a truck driver might have had with a trucking company before such trucking company became a trucking company client of TLC.

Petitioner did not persuade us at trial, and does not persuade us in petitioner's motion for reconsideration, that the duration of any employment relationship that may have existed between a truck driver and a trucking company before TLC decided to hire such truck driver as a driver-employee and before such trucking company became a client of TLC should be aggregated with the duration of the relationship between such trucking company client of TLC and such driver-employee where TLC leased such driver-employee to such trucking company client. Any employment

arrangement that may have existed between such a truck driver and such a trucking company was terminated when such trucking company became a trucking company client of TLC. The duration of any such employment relationship was not helpful to the Court in determining whether TLC was the employer of such truck driver where TLC decided to hire such truck driver as its driver-employee and leased such driver-employee to such trucking company client. That is why, on the facts presented in the instant case, the Court found in Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 195:

> In the instant case, it is the nature, and not the duration, of the relationship between a driver-employee and TLC and the relationship between a driver-employee and a trucking company client that determines whether TLC or such trucking company client is the employer of such driver-employee. [Emphasis added.]

In contrast to the instant case, the Court in Beech Trucking Co. did not have before it a situation where the employment arrangement between a truck driver and Beech Trucking Company was terminated when Beech Trucking Company decided to become a client of ATS. In addition, insofar as the record in Beech Trucking Co. revealed, the functions performed by ATS (the driver-leasing company) and Beech Trucking Company with respect to the truck drivers were to some degree blurred. Beech Trucking Co. v. Commissioner, 118 T.C. at 441. As the Court in Beech Trucking Co. understood the arrangement between Beech Trucking Company and ATS, truck drivers hired to drive for Beech Trucking Company were

to drive, apparently for an indefinite period, equipment owned by Beech Trucking Company, which had final authority to fire them. Id. at 431. That is why the Court in Beech Trucking Co. stated that "the relationship between the drivers and Beech Trucking was apparently of indefinite duration." Id. at 442.

With respect to petitioner's argument that the Court in Transport Labor I "added a factor inapplicable to three-party transactions", petitioner asserts that "In a three-party arrangement it is expected that the leasing company will treat the drivers as employees for purposes of employment taxes, such as FUTA and FICA taxes." On the record before us, we reject petitioner's assertion.

Petitioner's assertion that in a "three-party arrangement it is expected that the leasing company will treat drivers as employees for purposes of employment taxes" is not supported by the record in the instant case. The record in Transport Labor I established facts relating to TLC, its trucking company clients, and its driver-employees, but did not establish facts relating to expectations in "three-party arrangements" generally.

In the instant case, if, as petitioner asserts, a trucking company client expected TLC to treat each driver-employee as an employee for employment taxes purposes, it was because such trucking company client expected that TLC would be the employer for all purposes. In that connection, the Court in Transp. Labor

Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 193, stated:

> With respect to each driver-employee, for each payroll period TLC was obligated to, and did, pay such driver-employee his or her net wages and any per diem amounts as well as the employer's share of employment taxes, withhold and pay the driver-employee's share of employment taxes, withhold and pay Federal and State income taxes, make daily electronic funds transfers of the appropriate amounts of such taxes to the IRS and appropriate State agencies, and pay workers' compensation insurance premiums.

The obligations to pay the employer's share of employment taxes, to withhold and to pay the employee's share of employment taxes, and to withhold and to pay Federal income tax with respect to an employee's wages are obligations generally imposed upon an employer. Secs. 3102(a), 3111(a), 3301, 3402, 3403. TLC's undertaking and satisfying the obligations to withhold and to pay FICA taxes,[32] other employment taxes, and Federal income tax with respect to each driver-employee's wages evidenced that TLC was the employer of each driver-employee. See Kirk v. Harter, 188 F.3d 1005, 1008 (8th Cir. 1999); Birchem v. Knights of Columbus, 116 F.3d 310, 313 (8th Cir. 1997); Wilde v. County of Kandiyohi, 15 F.3d 103, 105-106 (8th Cir. 1994).

In addition, with respect to petitioner's assertion that TLC was the employer of each driver-employee for all purposes except the section 274(n)(1) limitation because TLC was what petitioner

---

[32]See Levine v. Commissioner, T.C. Memo. 2005-86.

refers to as a so-called administrative employer of each driver-employee, petitioner does not cite, and we have not found, any authority that supports petitioner's suggestion that an entity may selectively be the employer for purposes of withholding and/or paying employment and Federal income tax but not for other purposes such as the section 274(n)(1) limitation.

With respect to petitioner's argument that, in finding certain facts, the Court in Transport Labor I gave improper weight to certain evidence, petitioner asserts:

> The Court's reliance on the Lease Agreement, Driver Handbook, and Driver's Contract also is contrary to Beech Trucking. As Beech Trucking noted, it is well-established that "[a] contract purporting to create an employer-employee relationship is not controlling where application of the common law factors to the facts and circumstances indicates the absence of such a relationship." * * *

> Furthermore, the Court gave too much weight to the Driver Handbook. The Handbook only described ordinary activities carried out by truck drivers that were either recitations of Department of Transportation requirements, obvious to a licensed truck driver, or merely advisory, not mandatory. While TLC may have had written policies aimed at reducing workers' compensation claims, there is no evidence that TLC controlled the work of the drivers through those policies. [Citations omitted.]

On the record before us, we reject petitioner's assertion.

A contract purporting to create an employer-employee relationship is not controlling where application of the common-law employment factors to the facts and circumstances indicates the absence of such a relationship. Profl. & Executive Leasing,

Inc. v. Commissioner, 89 T.C. 225, 233 (1987), affd. 862 F.2d 751 (9th Cir. 1988). Petitioner does not cite, and we have not found, any authority which requires the Court to ignore a contract that designates a person as the employer of certain individuals where the totality of the facts and circumstances surrounding such person, such individuals, and one or more third persons who use the services of one or more of such individuals is not inconsistent with such a contract. In Transport Labor I, petitioner failed to show that the totality of the facts and circumstances surrounding TLC, each driver-employee, and each trucking company client was inconsistent with the exclusive lease agreement under which each such trucking company client used the services of one or more of such driver-employees.

As an illustration, the exclusive lease agreement provided in pertinent part that TLC "shall in its absolute discretion, hire * * * Lessor's [TLC's] employees". Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 160. The Court in Transport Labor I found that TLC retained the sole and absolute authority to hire each driver-employee. Id. at 164. The record in the instant case established: (1) Before TLC hired a truck driver as a driver-employee, such truck driver had to pass TLC's screening and approval process, which was designed to determine a truck driver's fitness to serve as a driver-employee of TLC; (2) TLC hired approximately 25 percent of its driver-

employees through its own recruitment efforts; and (3) TLC rejected 10 to 15 percent of the truck drivers whom its trucking company clients referred to it.  Id.  In Transport Labor I, petitioner failed to show that the totality of the facts and circumstances with respect to the hiring of each driver-employee was inconsistent with the exclusive lease agreement.

As a further illustration, the exclusive lease agreement provided in pertinent part that TLC shall "direct the work and conduct" of each driver-employee.  The Court in Transport Labor I found that TLC had the right to, and did, direct and control each driver-employee as to the operation and the loading and unloading of the truck of the trucking company client that leased such driver-employee from TLC and as to the details and means by which that operation and that loading and unloading were to be accomplished.  Id. at 168.  TLC exercised that right through, inter alia, the driver contract that TLC required each driver-employee to sign and the TLC driver handbook, which was incorporated into and made part of that driver contract.  In Transport Labor I, petitioner failed to show that the totality of the facts and circumstances with respect to the control exercised over each driver-employee was inconsistent with the exclusive lease agreement.

As a final illustration, the exclusive lease agreement provided in pertinent part that TLC "shall in its absolute

discretion, * * * fire * * * Lessor's [TLC's] employees". Id. at 160. The Court in Transport Labor I found that TLC retained the sole and absolute authority to terminate each driver-employee's employment with TLC. Id. at 164. The record in the instant case established: (1) If a trucking company client no longer wanted or needed the services of a particular driver-employee, TLC did not continue leasing such driver-employee to that trucking company client but instead attempted to lease such driver-employee to another trucking company client; and (2) TLC also reassigned to another trucking company client any driver-employee who no longer wished to work with a particular trucking company client to which TLC had assigned such driver-employee. Id. at 169-170. In Transport Labor I, petitioner failed to show that the totality of the facts and circumstances with respect to the termination of each driver-employee's employment was inconsistent with the exclusive lease agreement.

With respect to petitioner's assertion that the Court in Transport Labor I "gave too much weight" to the TLC driver handbook and the driver contract, not only does that assertion ignore that the Court is "the trier of the facts, the judge of the credibility of witnesses and of the weight of the evidence, and the drawer of appropriate inferences", Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347, it

disregards that TLC had the right to, and did, direct and control each driver-employee as to the operation and the loading and unloading of the truck of the trucking company client that leased such driver-employee from TLC and as to the details and means by which that operation and that loading and unloading were to be accomplished, Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 168.  The TLC driver handbook, which was incorporated into and made part of the driver contract, contained TLC's detailed instructions that it required each driver-employee to follow with respect to, inter alia, fueling the trucks, starting the trucks' engines, hooking up the trucks to trailers, parking the trucks, driving the trucks to achieve maximum fuel savings, braking the trucks, operating trucks in cold weather, departure times of the trucks, and loading the cargo on and unloading it off the trucks.[33]  Id.  Each driver contract provided other instructions for each driver-employee. Such instructions required that each driver-employee was, inter alia, to attend at least two safety meetings per year, not to be under the influence of alcohol while performing services for TLC, not to consume illegal drugs, to complete any paperwork required

---

[33]The record does not support petitioner's assertion that the TLC driver handbook contained only instructions that were recitations of Department of Transportation requirements or that were obvious to a licensed truck driver.  Even if the record supported petitioner's assertion, TLC required its driver-employees to follow the instructions in the TLC driver handbook.

by TLC or its affiliates, and not to allow any personal, legal or financial problems, including attitude, to interfere with the performance of services for TLC. If a driver-employee failed to comply with such instructions, TLC could terminate such driver-employee's employment. Id. at 165-166.

The Court in Transport Labor I found that the driver contract and the TLC driver handbook, which was incorporated into and made part of the driver contract, evidenced that TLC had the right to, and did, control the work and conduct of each driver-employee. Id. at 188. Consequently, the Court gave appropriate weight to such evidence.

With respect to petitioner's argument that, in finding certain facts, the Court in Transport Labor I gave improper weight to certain evidence, petitioner advances several additional assertions with respect to certain common-law employment factors, which we address below.

Right To Control Driver-Employee

Petitioner contends that the Court in Beech Trucking Co. found that Beech Trucking Company controlled the truck drivers whom ATS leased to it because Beech Trucking Company performed certain dispatching functions with respect to such truck drivers. Petitioner asserts that the Court in Transport Labor I should have found that each trucking company client controlled each driver-employee whom TLC leased to such trucking company client

because such trucking company client performed dispatching functions with respect to such driver-employee similar to the dispatching functions that Beech Trucking Company performed. On the record before us, we reject petitioner's assertion.

The Court in Transport Labor I found that during the taxable years at issue each trucking company client performed dispatching functions with respect to each driver-employee whom TLC leased to such trucking company client by giving each driver-employee his or her route assignments, directing each driver-employee as to the loads assigned to him or her and as to the times by which such driver-employee had to deliver those loads, and relaying any instruction of its customers relating to such loads (sometimes hereinafter referred to collectively as the trucking company client dispatching functions). Id. at 167. The Court also found that each trucking company client's performing such dispatching functions did not give such trucking company client control over each driver-employee within the meaning of section 31.3121(d)-1(c)(2) of the Employment Tax Regulations. Id. at 188. The Court found in Transport Labor I that the dispatching functions that each trucking company client performed were necessary for the operation of such trucking company client's trucking business. Id. at 167. That is to say, in order for a trucking company client to operate its trucking business successfully, such trucking company client had to give each

driver-employee his or her route assignments, direct each driver-employee as to the loads assigned to him or her and as to the times by which such driver-employee had to deliver those loads, and relay to each driver-employee any instruction of its customers relating to such loads.

In contrast, in order for TLC to operate its driver-leasing business successfully, TLC had to direct and control the work and conduct of its driver-employees in order to, inter alia, minimize workers' compensation claims of such driver-employees. A principal advantage for a trucking company of leasing driver-employees from TLC, as opposed to employing truck drivers directly, related to TLC's ability to obtain cost-effective workers' compensation insurance for TLC's driver-employees. Id. at 158. In order to minimize workers' compensation claims and thereby enable TLC to maintain cost-effective workers' compensation insurance, TLC had to, and did, control the work and conduct of each driver-employee. If TLC had not controlled the work and conduct of each driver-employee so as to minimize workers' compensation claims, its workers' compensation insurance expense would have increased substantially, thereby negating a principal advantage for a trucking company in leasing driver-employees from TLC, instead of employing truck drivers directly.

As discussed above, each exclusive lease agreement provided in pertinent part that TLC had the right to, and did, exercise

control over the work and conduct of each driver-employee, id. at 168, and that TLC exercised that right through, inter alia, the TLC driver handbook and the driver contract, id. at 188. The Court in Beech Trucking Co. did not have evidence before it, such as the exclusive lease agreement, the driver contract, and the TLC driver handbook that was incorporated into and made part of the driver contract, which would have enabled the Court in Beech Trucking Co. to have found facts such as those the Court found in Transport Labor I. It is mere speculation on the part of petitioner to assume that if the facts in Beech Trucking Co. had been virtually the same as the facts in the instant case, which they are not, the Court in Beech Trucking Co. nevertheless would have found that Beech Trucking Company controlled the work and conduct of the truck drivers whom it leased from ATS because of the dispatching functions that Beech Trucking Company performed with respect to such truck drivers.

With respect to whether TLC controlled the work and conduct of each driver-employee, petitioner asserts:

> the Court overlooked the testimony of Ardell DeBerg, TLC's CEO and former sales representative. Mr. DeBerg testified that in all important respects, the control of the trucking company over the drivers was unchanged by the Lease Agreement. In other words, the control of the trucking companies over the drivers when the drivers were indisputably employees of the trucking companies did not change after TLC took over administrative functions.

On the record before us, we reject petitioner's assertion.

Ardell DeBerg (Mr. DeBerg), TLC's chief executive officer at the time of the trial in the instant case and TLC's sales representative during the years at issue, gave the testimony that petitioner cites with respect to the statement that "TLC becomes the employer." That statement appeared in a form letter that Mr. DeBerg, as TLC's sales representative, sent to prospective clients. Mr. DeBerg testified (Mr. DeBerg's testimony):

> TLC becomes the employer. What I used to explain was an issue for the trucking company owner normally was but they're my employees. What are my employees going to think if now you become the employer. That was usually an issue for them.
>
> I would explain to them that there's really two kinds of employers. There's the administrative employer, which that's what we are. We take care of all the tax deposits, the tax returns for the employees, the work comp insurance, and then there's the physical employer, which you remain the physical employer. You tell them -- well, the phrase we used to use was, The worse thing that can happen is nothing changes.
>
> What I used to use quite often was: In order to be an employer, you need to be an attorney, you need to be an accountant, you need to be a priest and a shrink sometimes. Lean on us to be the attorney and the accountant, and we handle all that back room work for you, but you're still the boss. You handle the day-to-day tasks, so the worst thing that can happen is nothing changes. The employee doesn't really -- we're pretty invisible. [Reproduced literally.]

Contrary to petitioner's assertion, the Court in Transport Labor I did not overlook the testimony of Mr. DeBerg. Petitioner chooses to focus on the portion of Mr. Deberg's testimony where he stated: "You handle the day-to-day tasks, so the worst thing

that can happen is nothing changes.  The employee doesn't really -- we're pretty invisible."  The Court considered Mr. DeBerg's statement "the worst thing that can happen is nothing changes" to be a sales pitch and, as such, gave it no weight.

The Court considered Mr. DeBerg's testimony concerning each trucking company client's handling "the day-to-day tasks" to be a reference to the dispatching functions that each trucking company client performed.  Such interpretation is shared by petitioner. In petitioner's memorandum in support of petitioner's motion for reconsideration, petitioner points to testimony by Ms. Fiereck and George Erger, a former employee of Parkway, that Parkway continued to perform trucking company client dispatching functions after Parkway entered into the exclusive lease agreement with TLC as corroborating Mr. DeBerg's testimony that each trucking company client continued to handle the "day-to-day tasks".  As discussed above, the Court in Transport Labor I found that each trucking company client's performing the trucking company client dispatching functions did not give such trucking company client control over each driver-employee within the meaning of section 31.3121(d)-1(c)(2) of the Employment Tax Regulations.  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 188.

Hiring of Each Driver-Employee

Petitioner asserts:

> Ms. Schrupp also testified that TLC's involvement in hiring was limited to an advisory role; TLC did administrative screening and performed a DOT-required background check "so that [TLC could] advise the client if this is a good prospect for them." * * *

On the record before us, we reject petitioner's assertion.

Ms. Schrupp's testimony that TLC's involvement in hiring was limited to an advisory role (Ms. Schrupp's testimony with respect to hiring) was given with respect to a one-page marketing brochure. During the taxable years at issue, Ms. Schrupp worked in payroll and sales and marketing support. Ms. Schrupp would not have been in the best position to observe TLC's hiring procedures. Ms. Schrupp's testimony with respect to hiring was inconsistent with: (1) The testimony of Ms. Fiereck, whom the Court found to be credible, id. at 186, that "the relationship that they [TLC] had was for the hiring and firing or termination of that driver";[34] (2) TLC's screening and approval process, which each truck driver had to pass before TLC decided whether to hire such truck driver as a driver-employee; (3) the parties' stipulation that TLC hired approximately 25 percent of its driver-employees through its own recruitment effort, thereby rejecting petitioner's assertion that TLC's involvement in the hiring of each driver-employee was limited to an advisory role;

---

[34]See supra note 27.

(4) Ms. Fiereck's testimony that 10 to 15 percent of truck drivers referred to TLC were rejected by TLC, thereby rejecting petitioner's assertion that TLC's involvement in the hiring of each driver-employee was limited to an advisory role; and (5) the exclusive lease agreement that TLC entered into with each trucking company client, which provided in pertinent part that TLC had the sole and absolute authority to hire each driver-employee.[35]

The evidence supporting a finding that TLC had the sole and absolute authority to hire each driver-employee substantially outweighed Ms. Schrupp's questionable testimony that TLC exercised only an advisory role in the hiring of each driver-employee. Consequently, the Court did not rely on such testimony of Ms. Schrupp.

Right To Assign Additional Projects to Each Driver-Employee

Petitioner asserts:

There is no evidence that TLC reassigned drivers while they were working for the trucking companies. In fact, the parties agreed that "[i]n practice, TLC did not reassign a Driver once the Driver was assigned to a Trucking Company without permission from the Trucking Company." * * * Moreover, respondent presented no evidence that drivers were ever reassigned. Again, the Opinion elevates the form of the Lease Agreement over the substance of the actual relationship.

---

[35]As discussed above, petitioner failed to show in Transport Labor I that the totality of the facts and circumstances surrounding TLC, each driver-employee, and each trucking company client was inconsistent with the exclusive lease agreement.

On the record before us, we reject petitioner's assertion.

Petitioner's assertion that "There is no evidence that TLC reassigned drivers while they were working for the trucking companies" is not supported by the record.  The Court in Transport Labor I found that TLC "reassigned to another trucking company client any driver-employee who no longer wished to work with a particular trucking company client to which TLC had assigned such driver-employee."  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 170.  The record contained batch reports that have a column titled "Reassign Date", and certain of those batch reports reflected the dates on which certain driver-employees were reassigned from certain trucking company clients.  TLC's practice of not reassigning a driver-employee once such driver-employee was assigned to a trucking company client which desired to lease such driver-employee and for which such driver-employee wanted to work was merely a sound business practice by TLC.  Id. at 190.  TLC, like any business, was interested in accommodating, to the extent feasible, the requests of its trucking company clients.  Id.

Assuming arguendo that the record had established that TLC never reassigned any driver-employee, petitioner is wrong in asserting that TLC must have actually reassigned a driver-employee in order for TLC to be the employer of such driver-employee.  It was the right to assign additional projects to each

driver-employee, and not the actual assignment of such projects, that evidenced that TLC was the employer of such driver-employee. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); Alford v. United States, 116 F.3d at 338; Beech Trucking Co. v. Commissioner, 118 T.C. at 440. In Transport Labor I, the Court found that while TLC was leasing a driver-employee to a trucking company client, TLC had the right to lease that driver-employee to another trucking company client and thereby assign additional projects to such driver-employee. Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, supra at 169.

Employee Benefits for Each Driver-Employee

With respect to the sponsorship of employee benefits, petitioner asserts that each trucking company client paid for various benefits, including a section 401(k) plan, section 125 flexible benefit plan, group or individual health insurance, and $5,000 group term life insurance policy (collectively, the employee benefits) provided to each driver-employee and that that alleged fact supports its position that each trucking company client was the employer of each driver-employee whom TLC leased to such trucking company client. In support of that assertion, petitioner contends as follows:

> The Opinion found that TLC sponsored 401(k), 125 flexible benefit, and group/individual health insurance plans. The Opinion overlooked the testimony of Ms. Schrupp, who testified:

> > Q:  And when you say that TLC offers benefits

like 401(k) and health insurance, does TLC
actually bear the cost of those benefits?

A: **No. It's paid by the trucking company**.

(Tr. 92:10-13(Schrupp)(emphasis added).)

Q: [D]oes TLC pay for any portion of those
benefits?

A: Not to my knowledge.

(Tr. 103:12-15(Schrupp).) [Reproduced literally.]

On the record before us, we reject petitioner's assertion.

The Court did not overlook the above-quoted testimony of Ms.
Schrupp. The Court found that testimony, like Ms. Schrupp's
testimony with respect to the hiring of driver-employees, to be
questionable. Indeed, Ms. Schrupp's testimony that each trucking
company client paid for the costs of the employee benefits was
contradicted by her own testimony and by the parties' stipulation
of facts. On cross-examination by respondent's counsel, Ms.
Schrupp testified:

Q Now, Ms. Schrupp, TLC has a 401(k) plan.
Correct?

A Yes.

Q And not all the drivers participate in it, but
some do. Correct?

A Correct.

Q And the payments for the drivers who
participate in the 401(k) plan are paid for by the
drivers through payroll withholding. Correct?

A Correct.

Q   TLC also has a flexible spending plan.
Correct?

A   Yes.

Q   And, again, some of the drivers participate and
some do not.

A   Correct.

Q   And the drivers who participate pay for that
themselves through payroll withholding.   Correct?

A   Correct.

Q   And TLC also offers health insurance to the
drivers.   Correct?

A   Yes.

Q   Now, in some instances, drivers pay for that
health insurance solely through payroll deductions.
Correct?

A   I believe that the trucking company had a
participation level that they had to pay for.

Q   So your understanding is that as to health
insurance, there was participation by the trucking
companies in all cases or just some?

A   Some.

The parties' stipulation of facts provided in pertinent

part:

The cost of the $5,000 group term life insurance policy
was paid for by TLC.   TLC bore the cost of
administering the other * * * [employee benefits], but
these administrative costs did not contribute to the
direct costs of the benefits.   In most cases, the
direct costs of the benefits were funded entirely by
the Drivers through payroll deductions.   However, some
Trucking Companies did contribute to the cost of the
Drivers' health insurance. * * *

Termination of the Employment of a Driver-Employee

Petitioner asserts:

> In other words, even though drivers in Beech Trucking
> may have been turned back to the leasing company for
> reassignment, the Court [in Beech Trucking Co.] looked
> to the termination of the relationship between the
> driver and the trucking company, which in practice the
> trucking company controlled.

Petitioner appears to be contending that, because a trucking

company client was able to decline continuing to lease a

particular driver-employee whom it no longer wished to use, such

trucking company client had the authority to terminate such

driver-employee's employment with TLC. That is because,

according to petitioner, the Court in Beech Trucking Co. found

that Beech Trucking Company's declining to continue leasing a

truck driver whom it no longer wished to use evidenced that Beech

Trucking company had the final authority to terminate such truck

driver's employment with ATS. Beech Trucking Co. v.

Commissioner, 118 T.C. at 442. On the record before us, we

reject petitioner's assertion.

In contrast to the instant case, the record in Beech

Trucking Co. did not establish that ATS (the driver-leasing

company) leased truck drivers to any entity other than Beech

Trucking Company.[36] Id. at 443. Insofar as the record in Beech

---

[36]Moreover, as discussed above, there was no evidence, and
petitioner does not contend, (1) that petitioner or TLC had any
overlapping personnel with any trucking company client, (2) that
(continued...)

Trucking Co. revealed, by declining to continue leasing a truck driver whom it no longer wished to use, Beech Trucking Company, in effect, assured such truck driver's termination as an employee.

In the instant case, during the years at issue TLC had between 100 and 300 trucking company clients. Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 156. As of the time of trial in this case, TLC leased a total of 5,563 driver-employees to a total of 453 trucking company clients. Id. TLC frequently was successful in reassigning a driver-employee from one trucking company client that no longer wished to use such driver-employee to another trucking company client. Id. at 169-170. A trucking company client's declining to continue leasing a driver-employee whom it no longer wished to use did not evidence that such driver-employee's employment with TLC was terminated. TLC also reassigned to another trucking company client any driver-employee who no longer wished to work with a particular trucking company client to which TLC had assigned such driver-employee. Id. The Court in Transport Labor I found that

---

[36](...continued)
petitioner or TLC owned any interest in any trucking company client, and (3) that any owner of a trucking company client owned an interest in petitioner. Cf. Beech Trucking Co. v. Commissioner, 118 T.C. 428, 430-431 (2002). The Court in Beech Trucking Co. also found that the roles of ATS and Beech Trucking were "to some degree blurred" with respect to the truck drivers' activities. Id. at 441.

TLC had the "sole and absolute authority * * * to terminate each driver-employee's employment with TLC."  Id. at 164.

With respect to petitioner's argument that, in determining whether TLC was the employer of each driver-employee whom it leased to one of its trucking company clients, the Court gave improper weight to certain facts that it had found, petitioner asserts:

> The Court used the term "neutral" to describe certain factors which the Court concluded were not important in its decision * * *.  This categorization of certain factors was in error for at least two reasons:  (1) the Court was not free to disregard certain factors; and (2) a factor should be considered "neutral" only when there is evidence favoring both sides, in other words, when the court is unable to determine which party the factor favors.

On the record before us, we reject petitioner's assertion.

As discussed above, the Court in Transport Labor I did not disregard any common-law employment factors.  With respect to petitioner's assertion that a common-law employment factor should be considered neutral only when there is evidence favoring both sides, that assertion ignores that the Court is "the trier of the facts, the judge of the credibility of witnesses and of the weight of the evidence, and the drawer of appropriate inferences", Hamm v. Commissioner, 325 F.2d at 938.  The Court in Transport Labor I was free to give evidence whatever weight it considered to be appropriate.  Moreover, the Court does not consider a factor to be neutral only when there is evidence

favoring both parties' positions.  For example, with respect to the factors used to determine whether a request for relief under section 6015(f) should be granted, a factor may be neutral when there is evidence that such factor is not applicable.[37]  In such a case, any such neutral factor does not weigh in favor of or against granting relief under section 6015(f).

The Court in Transport Labor I used the term "neutral" to designate those common-law employment factors which, after analysis based on the facts and circumstances in the instant case, did not assist the Court in determining whether TLC or each trucking company client was the employer of each driver-employee whom TLC leased to such trucking company client.  By way of illustration, in Transport Labor I the Court found that "TLC's leasing a driver-employee to a trucking company client for which such driver-employee had worked before such trucking company client entered into an exclusive lease agreement with TLC is a neutral factor in determining whether TLC was the employer of such driver-employee."  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 195.  The Court found such common-law employment factor to be neutral because, as discussed above, the record established that, when a trucking company became a client of TLC, such trucking company terminated whatever employment arrangement existed between a truck driver and such

---

[37]See, e.g., Lopez v. Commissioner, T.C. Memo. 2005-36.

trucking company. After analysis based on the facts and circumstances in the instant case, evidence that TLC leased a driver-employee to a trucking company client for which such driver-employee had worked before such trucking company client entered into an exclusive lease agreement with TLC did not assist the Court in determining whether TLC or such trucking company client was the employer of each driver-employee whom TLC leased to such trucking company client.

With respect to petitioner's argument that, in determining whether TLC was the employer of each driver-employee whom it leased to its trucking company clients, the Court gave improper weight to certain facts, petitioner advances several additional assertions with respect to certain common-law employment factors, which we address below.

Hiring of Each Driver-Employee

Petitioner asserts:

> The Court found on the hiring factor that TLC had the sole and absolute authority to hire each driver-employee. * * * This finding was based on the Lease Agreement, which gave TLC the "sole and absolute right to hire."
>
> Beech Trucking is to the contrary. The Court here overlooked the conclusion in Beech Trucking that an agreement of the parties would not control if the parties' conduct showed otherwise. Here the parties' Stipulation was that when a trucking company entered a Lease Agreement with TLC, "the Trucking Company would terminate all of its existing drivers' employment. TLC would then generally hire all of the drivers who passed its approval process and assigned them [back] to the Trucking Company." * * *

Also, while TLC advertised for and attempted to recruit new drivers, the parties stipulated that "the Trucking Companies located most new Drivers and then referred them to TLC for approval and hiring" by TLC for assignment to the trucking company that had located the driver for employment. * * * The trucking companies located about 75 percent of the new drivers, and TLC only located about 25 percent of the new drivers. * * *

The Court's analysis here is contrary to <u>Beech Trucking</u> in another respect. In <u>Beech Trucking</u>, the Court found that the leasing company hired the drivers and provided the drivers with some orientation. * * * Although the leasing company hired the drivers, the Court in <u>Beech Trucking</u> accurately described the leasing company's role as a "driver procurement and payroll service." * * * On nearly identical facts in this case, the Court inexplicably reached the opposite result. [Reproduced literally.]

On the record before us, we reject petitioner's argument.

As discussed above, the facts presented in <u>Beech Trucking Co.</u> are materially distinguishable from the facts in the instant case. In <u>Beech Trucking Co.</u>, ATS (the driver-leasing company) procured truck drivers for Beech Trucking Company but, as discussed above, the record was "unclear as to the extent of any business ATS might have had apart from the services it provided Beech Trucking". <u>Beech Trucking Co. v. Commissioner</u>, 118 T.C. at 443. Thus, insofar as the record in <u>Beech Trucking Co.</u> revealed, any truck drivers whom ATS procured were procured only for Beech Trucking Company's use. Indeed, Beech Trucking Company reimbursed ATS for any expenses related to ATS's truck driver procurement. <u>Id.</u> at 442.

In the instant case, TLC had the sole and absolute authority

to hire each driver-employee.  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 164.  Before TLC decided whether to hire a truck driver as a driver-employee, such truck driver had to pass TLC's screening and approval process. Id.  TLC hired approximately 75 percent of its driver-employees through referrals of trucking company clients, but TLC also hired approximately 25 percent of its driver-employees through its own recruitment efforts.[38]  TLC rejected 10 to 15 percent of truck drivers whom its trucking company clients referred to it.  Id. In addition, petitioner does not contend, and there is no evidence, that any trucking company client reimbursed TLC for TLC's expenses relating to TLC's recruitment of any driver-employee.

Petitioner does not explain how the parties' stipulation on which it relies[39] is inconsistent with the Court's finding in

---

[38]Petitioner does not explain how the referral by trucking company clients of approximately 75 percent of the driver-employees TLC hired supports its argument that TLC provided only "driver procurement" services.  That the trucking company clients referred to TLC approximately 75 percent of the driver-employees whom TLC hired suggests that such trucking company clients, and not TLC, were providing driver procurement services for TLC.  In addition, TLC hired a substantial number of its driver-employees, i.e., 25 percent, without referral from any trucking company client.  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 164.

[39]The stipulation in question states:

When a Trucking Company entered into a Lease Agreement with TLC, the Trucking Company would terminate all of
(continued...)

Transport Labor I that TLC had the sole and absolute authority to hire a truck driver as one of its driver-employees.  Id.  Indeed, the parties' stipulation supports the Court's finding.  When each trucking company client entered into an exclusive lease agreement with TLC, it ended whatever employment arrangement it had with the truck drivers who were then working for it and relied on TLC to provide through the exclusive lease agreement the services of one or more of TLC's driver-employees.[40]  Id. at 159.

---

[39](...continued)
its existing drivers' employment.  TLC would then generally hire all of the drivers who passed its approval process and assigned them to the Trucking Company.

[40]Section one of the exclusive lease agreement provided:

Lessor [TLC] hereby leases to Lessee [trucking company client] those drivers in the employment of Lessor during the term of the Agreement.  Lessee hereby leases Lessor's drivers on an exclusive basis and from and after the date of this Agreement, Lessee shall not employ, directly or indirectly, any drivers for its trucking operation except those agreed to be furnished by Lessor under this Lease Agreement or as otherwise provided herein.

Section nine of the exclusive lease agreement provided in pertinent part:

For purposes of this Agreement, Lessee warrants and represents to Lessor as follows:

*     *     *     *     *     *     *

* * * That during the term of this Agreement, Lessee shall not hire, lease, or utilize any drivers other than drivers to be furnished by Lessor hereunder except only in emergency situations duly disclosed to Lessor or upon
(continued...)

<u>Source of Instrumentalities and Tools</u>

Petitioner asserts:

> The parties stipulated in this case that the trucking
> companies were the source of the instrumentalities and
> tools of the drivers * * *, just as was the case with
> the trucking company in <u>Beech Trucking</u>.  Because the
> facts clearly favored TLC, this factor must be
> considered to be an indication that the trucking
> companies were the common law employers.

On the record before us, we reject petitioner's assertion.

The Court in <u>Beech Trucking Co.</u> based its findings and

conclusions upon the record before it.  As discussed above, the

record in <u>Beech Trucking Co.</u> was "relatively sparse".  It did not

contain evidence such as an exclusive lease agreement, a driver

contract, or a driver handbook.  <u>Beech Trucking Co. v.</u>

<u>Commissioner</u>, 118 T.C. at 441.  In addition, there was no

evidence, and petitioner does not contend, (1) that petitioner or

TLC had any overlapping personnel with any trucking company

client, (2) that petitioner or TLC owned any interest in any

trucking company client, or (3) that any owner of a trucking

company client owned an interest in petitioner.  Cf. <u>id.</u> at 430-

431.

In Transport Labor I, the Court found that, both before and

after entering into an exclusive lease agreement with TLC, each

trucking company client owned or leased the trucks, semitrailers,

---

[40](...continued)
Lessor's prior written consent.

terminals, and other equipment and facilities used in its trucking business (collectively, the trucking business instrumentalities and tools).  Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 167.  The Court also found in Transport Labor I that "TLC was a driver-leasing company that leased one or more truck drivers to small and mid-sized independent trucking companies which used such truck drivers to transport goods and merchandise."  Id. at 156.  TLC was in the business of leasing driver-employees, and not in the trucking business, and each trucking company client was in the trucking business.

Each trucking company client's owning or leasing the trucking business instrumentalities and tools for such client's trucking business did not evidence that such trucking company client was the employer of each driver-employee TLC leased to such trucking company client.  Such trucking company client needed to own or lease the trucking business instrumentalities and tools in order to conduct its trucking business, but could have procured the services of truck drivers to use in that business through other arrangements, e.g., by leasing them from a person engaged in the driver-leasing business.  Id. at 190, 194.

In contrast, TLC's failure to provide the trucking business instrumentalities and tools did not evidence that the driver-employees were not its employees because such instrumentalities

and tools were not the instrumentalities and tools of TLC's business, viz., leasing driver-employees. After analysis based on the facts and circumstances in the instant case, evidence that each trucking company client, and not TLC, provided the trucking business instrumentalities and tools did not assist the Court in determining whether TLC or each trucking company client was the employer of each driver-employee whom TLC leased to such trucking company client. That is why the Court in Transport Labor I found on the record presented to it that each trucking company client's owning or leasing the trucking business instrumentalities and tools used by each driver-employee whom it leased from TLC was a neutral factor in determining whether TLC was the employer of each driver-employee. Id. at 190. It is mere speculation on the part of petitioner to assume that if the facts in Beech Trucking Co. had been virtually the same as the facts in the instant case, which they are not, the Court in Beech Trucking Co. nevertheless would have found that Beech Trucking Company was the employer of the truck drivers whom it leased from ATS because Beech Trucking Company supplied the instrumentalities and tools to those truck drivers.

Method of Payment

Petitioner asserts:

> In addition, the Court here overlooked the uncontradicted testimony of Kristi Schrupp, who testified that the trucking company determined drivers' salaries and that there was no time when TLC would make

this decision. * * * Ms. Fiereck, respondent's witness, corroborated this testimony when she testified that the trucking company determined how much a particular driver was paid, and that TLC had no role in this determination. * * *

*     *     *     *     *     *     *

The Opinion found the factor of the source of funds used to pay payroll to be a "neutral" factor. On the other hand, the Opinion also found that TLC's preparing of the paychecks to be a factor evidencing TLC as the employer. The Court overlooked the fact that these conclusions are inconsistent, and elevated the substance of the transaction (the source of the funds) over the form of the transaction (the ministerial act of check processing).

The Court also disregarded the most important aspects of payroll. The trucking companies determined whether and how much the drivers would be paid. * * * The trucking companies also determined how drivers would be paid, i.e., by direct deposit, checks sent directly to the drivers, or checks sent to the trucking companies for distribution to drivers. * * * The Court should have concluded that this factor favored a finding that the trucking companies were the employers.

*     *     *     *     *     *     *

* * * In Beech Trucking, the Court on facts nearly identical to those here did not find method of payment to be a negative factor. Yet, the Court in this case inexplicably reached the opposite result. In Beech Trucking, the Court found that "although [the leasing company] issued the drivers' weekly paychecks, paid workers compensation [insurance premiums], and maintained a section 401(k) plan for the drivers, [the trucking company] reimbursed [the leasing company] weekly for its expenditures, plus a service charge." * * *

The facts here are even more compelling -- TLC did not advance funds and seek reimbursement from the trucking companies. Rather, TLC required payment before issuing payroll. Mr. DeBerg, Ms. Schrupp, and Ms. Fiereck all testified that the trucking company transferred funds to TLC, usually by wire transfer,

<u>before</u> TLC would issue checks. * * * [Reproduced literally.]

On the record before us, we reject petitioner's assertion.

Petitioner's assertion that the facts in <u>Beech Trucking Co.</u> are "nearly <u>identical</u> to those" in the instant case is wrong. As discussed above, the facts in <u>Beech Trucking Co.</u> are materially distinguishable from the facts in the instant case, including the facts relating to the "method of payment". In <u>Beech Trucking Co. v. Commissioner</u>, 118 T.C. at 442, the Court found that ATS, the driver-leasing company, issued the drivers' weekly paychecks, paid workers' compensation, and maintained a section 401(k) plan for the drivers and that Beech Trucking Company reimbursed ATS weekly for its expenditures and paid ATS a separate service charge for the services ATS rendered to Beech Trucking Company. In Transport Labor I, with respect to the "method of payment",[41] the Court found that each payroll period each trucking company client paid TLC a lease fee that was not broken down into component parts, which TLC used (1) to cover its costs, including the respective net wages and per diem amounts, if any, that TLC determined to pay its driver-employees, and (2) to generate a profit. <u>Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner</u>, 123 T.C. at 173-174. With the exception of certain

_____

[41]By "method of payment", we mean the method by which, for each payroll period, each trucking company client paid TLC the lease fee that it owed to TLC and TLC prepared and disbursed each driver-employee's paycheck.

trucking company clients that reimbursed TLC for certain premiums with respect to health insurance for certain driver-employees,[42] no trucking company client reimbursed TLC for any of TLC's expenses, and no trucking company client paid TLC a separate service charge.

Petitioner's assertion that the Court found in Transport Labor I that TLC's preparation of each driver-employee's paycheck was a factor evidencing that TLC was the employer of each driver-employee is wrong. Contrary to petitioner's assertion, the Court found in Transport Labor I, "that TLC's payment of each driver-employee's net wages and any per diem amounts is a factor evidencing that TLC was the employer of each driver-employee." Id. at 193. That was because it is the employer who pays the wages and any per diem due to his or her employees.[43]

Petitioner's assertion that the Court found in Transport Labor I that the factor relating to the source of the funds used to pay TLC's payroll obligation was a neutral factor is wrong. Contrary to petitioner's assertion, the Court found in Transport Labor I that "the method by which each trucking company client

---

[42]See supra note 8.

[43]Petitioner fails to mention that the Court in Transport Labor I found that TLC's limited opportunity for profit and limited risk of loss in its driver-leasing business were factors "evidencing that each trucking company client, and not TLC, was the employer of each driver-employee." Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 198.

paid TLC a lease fee to compensate TLC for leasing driver-employees to such trucking company client is a neutral factor in determining whether TLC is the employer of each driver-employee." Id. at 192-193. That TLC may have paid TLC's payroll obligation with moneys that it received from its trucking company clients did not evidence to the Court in Transport Labor I that TLC was or was not the employer of each driver-employee. Id. at 192. It is common business practice for a business to use moneys received from its clients or customers as payments for services or goods in order to cover its expenses. Id. Even if, as petitioner contends, TLC required payment of the payroll period net lease fee due from each trucking company client prior to paying TLC's payroll obligation, that fact would not evidence that TLC was or was not the employer of each driver-employee. A business may require payment at the time of, or even prior to, providing services or goods to its customers.[44]

Petitioner asserts that the Court in Transport Labor I

---

[44]In the instant case, TLC's obligation to pay TLC's payroll obligation with respect to each driver-employee whom it leased to a trucking company client accrued as such driver-employee performed services for TLC by driving a truck of such trucking company client that leased such driver-employee from TLC. TLC was obligated to pay TLC's payroll obligation with respect to each driver-employee whether or not the trucking company client to which TLC leased such driver-employee paid TLC the lease fee. TLC required payment of the lease fee after it provided the services of its driver-employees to its trucking company clients. Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, supra at 172.

ignored that each trucking company client "determined whether and how much the drivers * * * [and] how [such] drivers would be paid."  As we understand petitioner's assertion, petitioner contends that each trucking company client determined unilaterally without the agreement of TLC whether, how much, and how each driver-employee was to be paid.  Such a contention is contrary to the findings that the Court in Transport Labor I made based upon an examination of the entire record before it.

With respect to petitioner's assertion that each trucking company client determined how much each driver-employee was to be paid, the Court found in Transport Labor I that TLC and each trucking company client agreed in the exclusive lease agreement that such trucking company client was to submit for each payroll period a batch report to TLC which showed certain information that TLC needed in order to determine, inter alia, the amount of gross wages and per diem amounts, if any, to which each driver-employee was entitled, the amount of the lease fee to which TLC was entitled,[45] and the amount that TLC had to withhold in order to pay Federal and State income taxes and employment taxes with respect to each driver-employee.  Transp. Labor Contract/Leasing,

---

[45]For each payroll period, the batch report that each trucking company client submitted to TLC showed, inter alia, such trucking company client's calculation of the lease fee for such payroll period.  TLC used the information submitted by each trucking company client in each batch report to determine the lease fee that such trucking company client owed TLC for each payroll period.

Inc. & Subs. v. Commissioner, 123 T.C. at 161.  Included in the
information shown in the batch report that each trucking company
client submitted to TLC was the batch report lump sum amount with
respect to each driver-employee whom TLC leased to such trucking
company client.[46]  Id. at 170.  TLC and each trucking company
client agreed in the exclusive lease agreement to the method by
which the batch report lump sum amount was to be calculated.[47]
Id. at 173 n.28.  Pursuant to sections five and fifteen of the
exclusive lease agreement, in order to change that method that
agreement would have had to be modified, which would have
required the agreement of both TLC and the trucking company
client.  Id. at 161.  In Transport Labor I, the Court did not
find that the foregoing facts evidenced that each trucking
company client, and not TLC, was the employer of each driver-
employee.

With respect to petitioner's assertion that each trucking

---

[46]Neither the batch report nor any other document that a
trucking company client submitted to TLC showed the breakdown of
the batch report lump sum amount between gross wages and any per
diem amounts.  It was TLC that determined what portion of the
batch report lump sum amount with respect to each driver-employee
constituted gross wages and what portion, if any, constituted per
diem amounts.

[47]Pursuant to each exclusive lease agreement, each trucking
company client was to select the method which was to be used in
calculating the batch report lump sum amount for each driver-
employee whom TLC leased to such trucking company client and to
which TLC agreed in that lease agreement.  Virtually all of TLC's
trucking company clients selected a cents-per-mile or a
percentage-of-load-gross-revenue basis as the applicable method.

company client determined whether each driver-employee was to be paid, the Court in Transport Labor I was unable to find on the record presented that, once a trucking company client calculated the batch report lump sum amount with respect to each driver-employee whom it leased from TLC, such trucking company client determined whether TLC paid such driver-employee his or her net wages and any per diem amounts. The Court in Transport Labor I found that for each payroll period TLC was obligated to, and did, pay each driver-employee his or her net wages and any per diem amounts, regardless of whether the trucking company client to which TLC leased such driver-employee paid TLC the lease fee. Id. at 172. In Transport Labor I, the Court did not find that the foregoing facts evidenced that each trucking company client, and not TLC, was the employer of each driver-employee.

With respect to petitioner's assertion that each trucking company client determined "how drivers would be paid, i.e., by direct deposit, checks sent directly to the drivers, or checks sent to the trucking companies for distribution to drivers", petitioner relies on the following testimony of Ms. Schrupp on direct examination by petitioner's counsel:

> Q  And how were the drivers paid?
>
> A  The checks may have been sent back to the client, or they may have been mailed directly to the driver.
>
> Q  So they either went to the trucking company directly, or they went to the driver directly.

A  Correct.

Q  And who decided whether it would be directly to the driver or directly to the trucking company?

A  The trucking company.

Like Ms. Schrupp's testimony that TLC's involvement in hiring driver-employees was limited to an advisory role and her testimony that all of the employee benefits that TLC sponsored for the driver-employees were paid for by TLC's respective trucking company clients who leased such driver-employees from TLC, we found the above-quoted testimony of Ms. Schrupp to be questionable.  Decisions as to how an employee is to be paid (e.g., by direct deposit, by check sent directly to the employee or by check sent directly to a person for whom such employee is performing services pursuant to a contract between such person and another person) are decisions generally made only by such employee.  Thus, we did not understand Ms. Schrupp's testimony to mean that each trucking company client decided unilaterally how each driver-employee whom it leased from TLC was to be paid.[48] We understood such testimony to mean that each driver-employee whom a trucking company client leased from TLC gave instructions to such trucking company client as to how such driver-employee wanted to be paid and that such trucking company client informed

_____

[48]If Ms. Schrupp literally meant what she said regarding who decided how each driver-employee was to be paid, we reject such testimony as questionable and unreliable.

TLC as to what those instructions were.  In Transport Labor I,
the Court did not find that the above-quoted testimony of Ms.
Schrupp evidenced that TLC was or was not the employer of each
driver-employee.

Work of Driver-Employee as Part of Regular Business of TLC

Petitioner asserts:

> The business of a trucking company is to move
> cargo by truck.  TLC's business was to enter into
> contracts to lease personnel.  TLC's business would be
> the same whether it leased truck drivers or some other
> type of personnel.  By contrast, a trucking company
> cannot exist without drivers.  The drivers worked from
> the trucking companies' places of business and operated
> the trucking companies' equipment.
>
> The Court's conclusion in this case again was
> contrary to Beech Trucking because the Court did not
> find that "clearly, the drivers' work was part of the
> regular business" of the trucking companies.  Indeed,
> we are not aware of a single case in which a leased
> employee was found to be "part of the business" of a
> leasing company.

On the record before us, we reject petitioner's assertion.

In Transport Labor I, the Court found that each truck driver
whom TLC hired as a driver-employee played an integral role in
TLC's business of leasing driver-employees to its trucking
company clients.  Transp. Labor Contract/Leasing, Inc. & Subs. v.
Commissioner, 123 T.C. at 164.  TLC could not have conducted its
business of leasing truck drivers without the driver-employees
whom it leased to its trucking company clients.  Id. at 194.
Petitioner has not explained how TLC could have conducted its
business of leasing each driver-employee without employing such

driver-employee.  In contrast, each trucking company client could have conducted its trucking business by procuring the services of truck drivers to use in that business by hiring them directly and/or by leasing them from a person engaged in the driver-leasing business.  Id.

Per Diem Letters

In Transport Labor I, the Court found that, for each of the calendar years 1993, 1994, 1995, and 1996, TLC sent a per diem letter to each trucking company client, which set forth the total of all per diem amounts that TLC paid to the driver-employees whom it leased to such trucking company client during the preceding calendar year.  Id. at 176.  With respect to such per diem letters, petitioner asserts:

> The Court overlooked important evidence proving that far from being "self serving" and an attempt to bolster TLC's return position, the letters were part of the regular business practice of TLC long before the Section 274(n) issue arose to insure that the trucking companies that paid per diem were responsible for the Section 274(n) limitation to trucking companies.  TLC began the business practice of sending the letters following the close of the 1993 calendar tax year, over 10 years ago.  At the time that TLC began sending out the letters there was no need to "bolster" its return reporting position. * * *
>
> It was TLC's practice and intention that the trucking companies would be responsible for the Section 274(n) limitation on per diem, and it adopted procedures to inform the trucking companies that they were responsible for the deduction limitation at every step in the relationship.  Mr. DeBerg testified that the trucking companies were informed during the sales process that they would be subject to the per diem deduction limitation.  [Fn. ref. omitted.]

On the record before us, we reject petitioner's assertion.

Petitioner's asserts that "At the time that TLC began sending out the [per diem] letters there was no need to 'bolster' its return reporting position" with respect to the section 274(n)(1) limitation. We find that assertion to be disingenuous. That the IRS may not have been examining petitioner's consolidated returns for the years at issue at the time TLC sent out the per diem letters does not mean that petitioner and TLC were unaware of the tax issues under section 274(n) that the IRS might raise on audit of such returns. In this connection, in Transport Labor I the Court found the per diem letters to be a self-serving attempt to bolster petitioner's position (viz., that the section 274(n)(1) limitation did not apply to the per diem amounts that TLC paid to its driver-employees) in the respective consolidated Forms 1120 which petitioner filed for the taxable years at issue. Id. at 198-199. Each per diem letter was a self-serving declaration sent by TLC to each trucking company client, which set forth TLC's position that each trucking company client was subject to the section 274(n) limitation with respect to the per diem amounts that TLC paid to each driver-employee. At least certain of TLC's trucking company clients disagreed with that self-serving position of TLC. Id. at 177.

Petitioner asserts that "It was TLC's practice and intention that the trucking companies would be responsible for the Section

274(n) limitation". Regardless of what TLC's practice and intention with respect to the section 274(n)(1) limitation might have been, that practice and that intention were not made part of the exclusive lease agreement between TLC and each trucking company client. Indeed, the Court in Transport Labor I found (1) that there were no agreements between TLC and any trucking company client other than the agreement set forth in the exclusive lease agreement and (2) that the exclusive lease agreement was silent as to the section 274(n)(1) limitation. Id. at 159 n.9, 171 n.20. If there had been an agreement that each trucking company client was to be subject to the section 274(n)(1) limitation, such agreement would have been reflected in the exclusive lease agreement that TLC entered into with each trucking company client or some other written document signed by each such trucking company client.[49]

Petitioner asserts that the Court disregarded Mr. DeBerg's

---

[49]Sec. fifteen of each exclusive lease agreement provides:

No waiver or modification of this Agreement or of any covenant, condition or limitation herein contained shall be valid unless in writing and duly executed by the party to be charged therewith, and no evidence of any waiver or modification shall be offered or received in evidence of any proceeding, arbitration or litigation between the parties hereto arising out of or affecting this Agreement, or the rights or obligations of the parties, hereunder unless such waiver or modification is in writing, duly executed as aforesaid, and the parties further agree that the provisions of this Section may not be waived except as herein set forth.

testimony that "the trucking companies were informed during the sales process that they would be subject to the per diem deduction limitation." Petitioner is correct that the Court did not rely on such testimony of Mr. DeBerg. That is because such testimony was uncorroborated, served the interests of his employer TLC, and was inconsistent with section fourteen of the exclusive lease agreement.[50]

Based upon our examination of the entire record before us, we find that petitioner has failed to carry its burden of demonstrating unusual circumstances or substantial error in Transport Labor I. On that record, we shall deny petitioner's motion for reconsideration.

Petitioner's Motion To Vacate

In support of petitioner's position that the Court's

---

[50]Sec. fourteen of each exclusive lease agreement provides:

> This Agreement contains the complete agreement concerning the lease arrangement between the parties and shall, as of the effective date hereof, supercede [sic] all other agreements between the parties. <u>The parties stipulate that neither of them has made any representations with respect to the subject matter of this Agreement or any representations * * * except such representations as are specifically set forth herein and each of the parties hereto acknowledges that he or they have relied on their own judgement in entering into this Agreement. The parties hereto further ac-knowledge that any payments or representations that may have heretofore been made by either of them to the other are of no effect and that neither of them has relied thereon in connection with his or their dealings with the other.</u> [Emphasis added.]

decision in Transport Labor I should be vacated or revised, petitioner incorporates by reference the arguments in petitioner's motion for reconsideration and advances the following additional arguments:  (1) The Court's decision in Transport Labor I did not allow the parties an opportunity to submit computations under Rule 155 to show the correct amount of the respective deficiencies for the taxable years at issue; (2) the Court's decision failed to reduce the amounts subject to the section 274(n)(1) limitation pursuant to section 274(e)(3) (petitioner's section 274(e)(3) argument); and (3) the Court's decision did not reduce the respective deficiencies in petitioner's tax for the years at issue by certain amounts of tax allegedly paid by certain trucking company clients for those years (petitioner's tax duplication argument).  Respondent disagrees with petitioner's position.

A motion to vacate or revise a decision pursuant to Rule 162 is granted at the Court's discretion.  We have rejected petitioner's arguments in support of petitioner's motion for reconsideration.  We also reject those arguments in support of petitioner's motion to vacate.  Our discussion of petitioner's motion to vacate will address only the additional arguments that petitioner advances in that motion.

A motion to vacate or revise a decision pursuant to Rule 162 is usually denied in a case where the moving party attempts to

reopen a case for the purpose of presenting theories or grounds, and evidence in support thereof, that could have been advanced and supported at the trial in that case.[51] See <u>Concordia Coll. Corp. v. W.R. Grace & Co.</u>, 999 F.2d 326, 330 (8th Cir. 1993); <u>Chiquita Mining Co. v. Commissioner</u>, 148 F.2d 306, 310 (9th Cir. 1945), affg. a Memorandum Opinion of this Court dated Jan. 5, 1943; <u>Standard Knitting Mills, Inc. v. Commissioner</u>, 141 F.2d 195, 198-199 (6th Cir. 1944), affg. 47 B.T.A. 295 (1942). Generally, new issues may not be raised in a Rule 155 computation. <u>Harris v. Commissioner</u>, 99 T.C. 121, 123 (1992), affd. 16 F.3d 75 (5th Cir. 1994). "Issues considered in a Rule 155 proceeding are limited to 'purely mathematically generated computational items'." <u>Id.</u> at 124.

In support of petitioner's argument that the Court should vacate its decision in Transport Labor I because the Court did not allow the parties an opportunity to submit computations under Rule 155 to show the correct amount of the deficiency for each of the taxable years at issue, petitioner asserts that the parties stipulated that a Rule 155 computation was necessary in the instant case. Petitioner further asserts:

> The Court's Rule 155 contemplates two phases of a deficiency case: the first phase in which the petitioner has the burden of proving that the Commissioner's determination is invalid; and the second phase for the purpose of computing the amount of the

---

[51] <u>Taylor v. Commissioner,</u> T.C. Memo. 1987-403.

deficiency.  A taxpayer, such as TLC, had the burden of proving that the Commissioner's deficiency determination was invalid, but it did not also have the burden of showing the amount of tax, if any, that TLC owed.  To impose such a burden on TLC, as respondent would have the Court do, "would not be consonant with the great remedial purposes of the legislation creating" the U.S. Tax Court.  Helvering v. Taylor, 293 U.S. 507, 516 (1935).

\* \* \* \* \* \* \*

In many, but not all cases, evidence adequate to overthrow the Commissioner's findings is also adequate to show the correct amount that is due.  Id. [Helvering v. Taylor, 293 U.S. 507 (1935)] at 515.  For cases in which evidence is not adequate to show the correct amount due, Rule 155 permits the parties to submit computations to the Court based on the Court's opinion. \* \* \*

On the record before us, we reject petitioner's assertion.

Petitioner's assertion that the parties stipulated that a Rule 155 computation was necessary is wrong.  The parties stipulated:

On May 17, 1998, Petitioner filed a Corporation Application for Tentative Refund ("Form 1139") [petitioner's Form 1139] seeking tentative refunds for the tax years 1994, 1995, and 1996 of $460,999, $473,305, and $286,223, respectively.  These tentative refund claims were based on the carryback of a $3,589,781 claimed net operating loss from the tax year 1997.

\* \* \* Pursuant to I.R.C. § 6511(b), on or about May 27, 1998, Respondent issued Petitioner tentative refunds for the tax years 1994, 1995, and 1996, of $460,999, $473,305, and $286,223, respectively, based on the Form 1139.  If there is a decision on the per diem issue, a computation will have to take into account this refund for years in issue.

Tentative refunds, like the tentative refunds that

respondent issued to petitioner for its taxable years 1994, 1995, and 1996 (collectively, petitioner's tentative refunds), are rebates within the meaning of section 6211(b)(2).[52]  <u>Baldwin v. Commissioner</u>, 97 T.C. 704, 707-708 (1991).  Pursuant to section

---

[52]Sec. 6211 provides in pertinent part:

SEC. 6211.  DEFINITION OF A DEFICIENCY.

(a) In General.--For purposes of this title in the case of income, estate, and gift taxes imposed by subtitles A and B * * * the term "deficiency" means the amount by which the tax imposed by subtitle A or B * * * exceeds the excess of--

(1) the sum of

(A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus

(B) the amounts previously assessed (or collected without assessment) as a deficiency, over--

(2) the amount of rebates, as defined in subsection (b)(2), made.

     *       *       *       *       *       *       *

(b) Rules for Application of Subsection (a).--For purposes of this section--

     *       *       *       *       *       *       *

(2) The term "rebate" means so much of an abatement, credit, refund, or other payment, as was made on the ground that the tax imposed by subtitle A or B * * * was less than the excess of the amount specified in subsection (a)(1) over the rebates previously made.

6211(a), the amount of a deficiency for a taxable year is increased by the amount of any rebates for such taxable year.

In an amendment to answer, respondent asserted increased deficiencies in tax for petitioner's taxable years 1994, 1995, and 1996 on the ground that petitioner was not entitled to petitioner's tentative refunds. The Court stated in Transp. Labor Contract/Leasing, Inc. & Subs. v. Commissioner, 123 T.C. at 155 n.2:

> Our resolution of the issue remaining for decision will resolve the issues that respondent raised in the amendment to answer relating to the disallowance of an NOL carryback that petitioner claimed from its taxable year 1997.

Having held in Transport Labor I that the section 274(n)(1) limitation applied to the per diem amounts that TLC paid to its driver-employees, it was necessary, in order to calculate the correct amounts of the deficiencies for petitioner's taxable years 1994, 1995, and 1996, respectively, to add the amount of the tentative refund for each such taxable year to the amount of the deficiency that respondent had determined in the notice for each such year. Sec. 6211(a) and (b). That was the computation to which the Court understood the parties to be referring in the parties' stipulation of facts. That computation, which the Court made, was a straightforward calculation under section 6211(a) and

(b).[53]

As for petitioner's reliance on Helvering v. Taylor, 293 U.S. 507 (1935), that case is materially distinguishable from the instant case, and petitioner's reliance on it is misplaced. In Helvering v. Taylor, supra, the taxpayer carried its burden of proving that the determination of the Commissioner of Internal Revenue as to the amount of the taxpayer's deficiency was erroneous. However, the taxpayer did not develop a record upon which the trial court could have determined the correct amount, if any, of the deficiency. Id. at 511-512. Thus, it was appropriate in Helvering v. Taylor, supra, for the trial court to have conducted further proceedings to establish a record from which the trial court could have determined the appropriate amount, if any, of the deficiency. See Hamm v. Commissioner, 325 F.2d at 940. In this connection, the Court of Appeals for the Ninth Circuit stated in Cohen v. Commissioner, 266 F.2d 5, 11 (9th Cir. 1959), remanding T.C. Memo. 1957-172:

> When the Commissioner's determination has been shown to be invalid, the Tax Court must redetermine the deficiency. The presumption as to the correctness of the Commissioner's determination is then out of the case. The Commissioner and not the taxpayer then has the burden of proving whether any deficiency exists and if so the amount. It is not incumbent upon the taxpayer under these circumstances to prove that he owed no tax or the amount of the tax which he did owe. [Citations and fn. refs. omitted.]

In contrast to Helvering v. Taylor, supra, in Transport

---

[53]Petitioner does not contend that the Court made a mathematical error in making that calculation.

Labor I petitioner did not carry its burden of proving error in respondent's determination in the notice that petitioner was subject to the section 274(n)(1) limitation with respect to the per diem amounts that TLC paid to each driver-employee. Thus, the Court's holding that TLC was subject to that section 274(n)(1) limitation resulted in the Court's sustaining respondent's determination in the notice with respect to that limitation. No further proceedings were, or are, appropriate in the instant case. See Hamm v. Commissioner, supra at 940.

With respect to petitioner's section 274(e)(3) argument, petitioner asserts:

> The computation of the allowable deduction for food and beverage expenses is complex, but there is no dispute about the applicable law. Section 274(a) completely disallows deductions for certain expenses. Section 274(n) ameliorates the total disallowance of 274(a) by allowing a 50 percent deduction for food and beverage expenses. Section 274(e)(3) in turn provides that "the employer" is not subject to the limitations of Section 274, where the employee incurs the expense in the course of performing services for another person, such as here where the truck drivers incur expenses while performing services for the trucking companies. * * * The Section 274(e)(3) exception applies only where taxpayer "accounts" for the expenses, as required by Section 274(d). * * *

Petitioner further asserts that uncontradicted evidence demonstrated that TLC accounted to the trucking company clients for the per diem amounts that it paid to its driver-employees. On the record before us, we reject petitioner's assertion.

Petitioner first raised petitioner's section 274(e)(3) argument in its amended petition. However, petitioner did not

argue, or even mention, petitioner's section 274(e)(3) argument in its trial memorandum, at trial, or on brief.  Consequently, we concluded that petitioner had abandoned that argument.  See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).  It was only after the Court ruled against petitioner in Transport Labor I that petitioner decided to resurrect petitioner's section 274(e)(3) argument in petitioner's motion to vacate.  By doing so, petitioner is trying to advance in the context of a Rule 155 computation theories or grounds with respect to a position which it abandoned before the trial in this case and with respect to which petitioner wants the Court to hold a second trial at which petitioner would introduce new evidence in support of that position.

With respect to petitioner's tax duplication argument, petitioner asserts:

> As a result of the Court's Opinion in this case and without a Rule 155 proceeding, respondent will be in a windfall position — it will have collected tax on the same transaction twice.  Congress has explicitly recognized that only one taxpayer should be subject to the tax.  H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 429; see also Treas. Reg. § 1.274-2(f)(2)(iv)(a).  Respondent's computations in the Notices of Deficiency fail to take that double payment of tax into account.
>
> At the time of the audit of TLC's returns for the years at issue, the examining agent also was reviewing information related to TLC's customers to determine whether the customers had applied the deduction limitation.  The agent informed TLC during the examination that a significant number of TLC's customers applied the Section 274(n) deduction

limitation.[54]

> Accordingly, the actions and return positions of the other trucking companies must be reviewed to determine whether the deficiencies computed by respondent are correct. We respectfully request, therefore, that the Court vacate its Order [sic] of August 16 and order the parties to submit computations pursuant to Rule 155. This will permit the parties the opportunity to determine whether TLC's liability should be reduced by the amounts already paid by parties to the transaction.

On the record before us, we reject petitioner's assertion.

Petitioner did not advance petitioner's tax duplication argument in its petition, in its trial memorandum, at trial, or on brief. It was only after the Court ruled against petitioner in Transport Labor I that petitioner decided to advance petitioner's tax duplication argument in petitioner's motion to vacate. By doing so, petitioner is trying to advance in the context of a Rule 155 computation a new argument that it is raising for the first time in petitioner's motion to vacate.[55]

---

[54]There was no evidence in the record in this case establishing: (1) That the examining agent who audited the consolidated return that petitioner filed for each of the years at issue also conducted an audit of any of TLC's trucking company clients and (2) that any such examining agent made any statements to petitioner's officers, directors, or employees that a significant number of TLC's customers applied the sec. 274(n)(1) limitation to any amounts that they paid to TLC.

[55]Even if we were to allow petitioner to advance petitioner's tax duplication argument, petitioner would not be entitled to the remedy it seeks. If, as petitioner asserts, certain trucking company clients applied the sec. 274(n)(1) limitation to certain amounts that they paid to TLC as a lease fee, our findings and conclusions in Transport Labor I may have resulted in such trucking company clients' having overpayments of tax. The appropriate remedy in any such situation would be for any such trucking company client to seek a refund of any such

(continued...)

Generally, new issues may not be raised in a Rule 155 computation. <u>Harris v. Commissioner</u>, 99 T.C. at 123.

Based upon our examination of the entire record before us, we reject petitioner's argument that the parties stipulated that a computation under Rule 155 is necessary in order to determine the effect on the respective deficiencies for the years at issue of the tentative refunds that respondent erroneously issued to petitioner for such years. Based on that examination, we further find that petitioner's motion to vacate advances theories or grounds with respect to positions which petitioner raised for the first time in petitioner's motion to vacate or which petitioner abandoned before the trial in this case and with respect to which petitioner wants the Court to hold a second trial at which petitioner would introduce new evidence in support of those positions.

For the foregoing reasons and the reasons discussed above in connection with the Court's denial of petitioner's motion for reconsideration, we shall deny petitioner's motion to vacate.

We have considered all of the contentions and arguments of petitioner and respondent that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

---

[55](...continued)
overpayment.

To reflect the foregoing,

<u>An order will be issued denying petitioner's motion for reconsideration and petitioner's motion to vacate</u>.